# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,          )   Case No.: 3:24-CR-00186 (SVN)
                                   )
                   Plaintiff,      )   SENTENCING MEMORANDUM ON
                                   )   BEHALF OF RICARDO ESTRADA
Vs.                                )
                                   )
RICARDO ESTRADA,                   )
                                   )
                   Defendant       )
                                   )

The Defendant, RICARDO ESTRADA, respectfully files this sentencing memorandum as an aid to the Court regarding his sentencing scheduled for November 3, 2025.

A sentence must be no longer than necessary to further the purposes of United States Code (USC), Section 3553(a). In that regard, the defendant requests that this court consider a departure, a "non-Guideline" sentence or a sentence at the low end of the Guideline sentencing range.

The Guidelines are no longer binding and mandatory considering <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), and <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005).

Each factor set forth in the USC, Sec. 3553 (a) and the Guidelines should be considered by this Court. No one factor within the USC, Sec. 3553 (a) is elevated to controlling weight. The Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." <u>Crosby</u>, 397 F.3d at 113-

114. However, they are not the controlling factor, more important than all - or any - of the other factors listed in USC, Sec. 3553(a). After considering the Guidelines, the sentencing judge may impose either a Guidelines sentence, including one considering departures, or a "non-Guidelines" sentence. Id. at 113.

This case, at least as to this defendant, sets forth apparent reasons to grant a departure, impose a "non-Guideline" sentence, or a Guideline sentence at the low end of the sentencing range considering the factors in the USC, Sec. 3553 (a).

Section 3553(a) requires the court to impose a sentence "sufficient, but not greater than necessary," to promote the purposes of fair sentencing. Under <u>Booker</u>, "[s] ection 3553(a) remains in effect, and sets forth numerous factors that guide sentencing." <u>Booker</u>, 125 S. Ct. at 766. Those factors include:

1. the nature and circumstances of the offense and the history and characteristics of the defendant.

2. the need for the sentence imposed-

   a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.
   b. to afford adequate deterrence to criminal conduct.
   c. to protect the public from further crimes of the defendant; and
   d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

3. the kinds of sentences available.

4. the kinds of sentence and the sentencing range established for-

   a. the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

i. issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(P) of title 28); and

ii. that, except as provided in section 3742(g) are in effect on the date the defendant is sentenced; or

b. in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(P) of title 28).

5. any pertinent policy statement-

a. issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(P) of title 28); and

b. that, except as provided in section 3742(g) is in effect on the date the defendant is sentenced.

6. the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7. the need to provide restitution to any victims of the offense.

The court in <u>Crosby</u> declined to define how a district judge is to "consider" the Guidelines. Nothing in either <u>Crosby</u> or <u>Booker</u> suggests that a Guidelines range, once it is found, is to be considered "reasonable" or a default position. Although the court cautioned that judges should continue to "reduce unwarranted disparities," they should now be able to achieve "more individualized justice." <u>Crosby</u>, 397 F.3d at 113-14. "In short, there need be no 'fear of judging'." *Id.*

Since the Guidelines are no longer mandatory, district courts must consider the policy choices made by the Sentencing Commission in arriving at the Guidelines range for a case, but the judge is also free to disagree with those policy choices under the circumstances of the case, even if those circumstances are no longer "atypical" or "outside the heartland." "The Guidelines . . . are the product of policy decisions by the Sentencing Commission . . . If those policy decisions are no longer mandatory, the sentencing judge is free to disagree with them." <u>Booker</u>, 125 S. Ct. at 790 n.3 (Scalia, J., dissenting).

With these standards in mind, let us turn to this case.

1.      The nature and circumstances of the offense and the history and characteristics of the defendant.

A.      <u>The Nature & Circumstances of the Offense:</u>

On February 11, 2025, Mr. Estrada, appeared before the Honorable Sarala V. Nagala, United States District Judge. On that date, Mr. Estrada entered a guilty plea to Counts One and Three of the Indictment in Criminal Number 3:24CR00186(SVN). Count One charged Conspiracy, in violation of 18 U.S.C. § 371; and Count Three charged Kidnapping, in violation of 18 U.S.C. §§ 1201(a)(1) and 2.

On August 25, 2024, at approximately 5:30 PM, victims R.C. and S.C. were driving in their Lamborghini SUV. Suddenly, they were rear-ended by a Honda Civic. When they stepped out of their car to see what happened, a van pulled up beside them. Multiple men wearing masks jumped out and forced R.C. and S.C. into the van. The suspects punched and hit the victims, and then tied the victims' hands and taped over their mouths. As the assailants attempted to speed away, officers arrived on scene and began giving chase. See, PSR, para. 8, p. 5.

When Danbury Police Department (DPD) officers arrived on scene, they observed and pursued a white Ram ProMaster, which was traveling at a high rate of speed. The van eventually crashed and became disabled, approximately 1.2 miles from where DPD officers attempted to initiate the stop. See, PSR, para. 10, p. 5.

When the van crashed, four male suspects dressed in all black (later identified as Angel Borrero, Josue Romero, Reynaldo Diaz, and Anthony Pena) exited the van and fled on foot. See, PSR, para. 11, p. 5. All four individuals were located and arrested near the crash site. See, PSR, para. 12, p. 6.

When DPD officers arrived at the disabled van, an officer located the victims, S.C. and R.C., who were bound with duct tape around their arms and legs in the back of the van. See. PSR, para. 14, p. 6. Both victims sustained injuries. See, PSR, para(s). 15-17, pp. 6-7.

S.C. and R.C. told law enforcement that, while they were in the back of the van, one of the suspects in the back of the van started to yell something like, "Call Rick... we are in deep shit," and instructed the driver to drive fast. Agents believed the

suspects were referring to Ricardo Estrada, who was later arrested at a residence on Painter Hill Road in Roxbury, Connecticut for his involvement in this incident. See, PSR, para. 17, p. 7.

At first, DPD Officers were unable to locate the 2024 Lamborghini SUV that was operated by before S.C. and R.C. were abducted. However, a Danbury resident later contacted DPD dispatch and advised of a Lamborghini that appeared abandoned in the woods off a roadway in Danbury. Units from the DPD located a Lamborghini SUV abandoned and unoccupied in the woods. See, PSR, para. 21, p. 7.

As the investigation progressed, law enforcement recovered a phone from Josue Romero and found a video, which was time-stamped 5:43 p.m. on August 25, 2024. See, PSR, para. 25, p. 8. The video depicted Mr. Estrada driving the Lamborghini after the victims, S.C. and R.C., were intercepted by the van and the Honda Civic.

The video was recorded by Michael Rivas, the operator of the Honda Civic. In the video, the driver of the stolen Lamborghini, Mr. Estrada, appeared to be searching for a place to leave and hide the vehicle, which he did, off the roadway in the woods. See, PSR, para. 25, p. 8.

Subsequently, law enforcement discovered that a telephone number belonging to Mr. Estrada was pinging in an area consistent with the device being located on Painter Hill Road in Roxbury. Based on that, law enforcement believed that Mr. Rivas and Mr. Estrada returned to the house on Painter Hill Road in the white Honda Civic after. Officers and agents went to a residence on Painter Hill Road early in the morning on August 26, 2024. There, law enforcement contacted Mr. Rivas and Mr. Estrada, who

were inside the residence on Painter Hill Road. Both individuals exited the residence and were taken into custody without incident. See, PSR, para. 28, p. 9.

Mr. Estrada accepted responsibility for his conduct at the February 11, 2025, guilty plea canvass as well as at the PSR interview wherein he acknowledged the essential elements of the conspiracy and kidnapping charges. See, PSR, para. 32, p. 10.

The "why" of how he got to the emotional/psychological place to engage in such conduct is explained below.

B.     The History & Characteristics of the Defendant:

Personal and Family. Mr. Estrada is a 22-year-old single man of Cuban decent who came to the United States with his parents when he was 10 years old. Mr. Estrada's father is Yovani Martinez Rodriquez. His mother is Maria Antonio Estrada Fernandez. Mr. Estrada was born in Havana, Cuba. His parents were and remain married. He has two older paternal half-siblings, a sister who lives in Cuba and a brother who lives in Spain. He has a close relationship with his older half-siblings but has not seen them since he and his parents came to the United States. See, Report of Psychological Evaluation, p. 2.

When Mr. Estrada was two years old, his family moved to Tenerife, the largest of Spain's Canary Islands. When he was ten years old, the family came to the United States and lived in Kentucky near family for about 18 months before settling in Miami, Florida. In Miami, Mr. Estrada's father works as a truck driver for a tow company while his mother works at a local hotel. See, Report of Psychological Evaluation, p. 3.

**Substance Abuse.** Mr. Estrada and his mother dated his regular use of marijuana to mid-adolescence when he was a sophomore in high school. This is supported by Mr. Estrada being arrested at age 15 for possession of marijuana. See, PSR, para. 60, p. 14. He also started using Xanax around that time. He had experimented with other drugs, but marijuana and Xanax were his drugs of choice. See, PSR, para(s). 74-75, p. 16.

As a result of his drug use, Mr. Estrada's grades fell in the tenth grade. He dropped out at the end of the school year in 2019, when he was 16 years old to work.

When Mr. Estrada started working, he began to use oxycodone and prescription cough medicine with codeine. His opioid use escalated when he got involved with bitcoin trading because he could afford large doses of drugs. He had prescriptions for oxycodone and prescription codeine which he mixed with soft drinks and hard candy creating the street drug "lean." His drug abuse was affordable because of the money he made in bitcoin trading. See, Report of Psychological Evaluation, pp. 9-10.

Mr. Estrada attempted to withdraw from opioids several times. However, he continued to relapse, binge and abstain repeatedly. Mr. Estrada's heaviest opioid use occurred from 2022 until the time of his arrest in this case. When first incarcerated, Mr. Estrada was treated for opioid withdrawal. He was treated with Subutex (buprenorphine) and gabapentin. These drugs are frequently used to manage opioid withdrawal. He was later treated with a medication for anxiety and to help him sleep. See, Report of Psychological Evaluation, p. 10.

In addition to using opioids, Mr. Estrada drank alcohol in high school. For Mr.

Estrada, drinking was fun while drugs helped him manage his life. Despite this addiction to drugs and alcohol, Mr. Estrada never received long-term drug or alcohol treatment. See, Report of Psychological Evaluation, p. 10.

Mental & Emotional Health. Mr. Estrada's mental and emotional health is related to his drug use. From 2022 through 2024, Mr. Estrada had at least four emergency room visits and at least two psychiatric hospitalizations related to suicide risk and an opioid overdose. See, Report of Psychological Evaluation, p. 8.

At the age of ten years, Mr. Estrada began cutting his arms and legs with glass and a razor blade. Despite this behavior, Mr. Estrada received no counseling or psychiatric treatment as a child as an early adolescent. See, Report of Psychological Evaluation, p. 8.

On March 29, 2024, the Miami police prepared an emergency evaluation report, which stated that Mr. Estrada needed transport to the ER because he was at risk of suicide. Mr. Estrada exhibited multiple self-inflicted cuts on his arms. See, Report of Law Enforcement Officer / Involuntary Examination.

In addition, Mr. Estrada had two other emergency admissions for opioid overdoses. During one emergency admission, Mr. Estrada was referred to a therapist, who diagnosed him with a borderline personality disorder. However, Mr. Estrada never followed through with treatment. See, Report of Psychological Evaluation, p. 9.

Educational, Employment Record & Vocational Skills. Mr. Estrada received his high school diploma while incarcerated at the Manson Youth Institution. Before tenth grade, Mr. Estrada did well in school. He navigated different school systems from

Tenerife to Louisville and to Miami. In high school, Mr. Estrada participated in a program wherein students who were strong in science would go on to college and beyond. Mr. Estrada wanted to be a scientist. However, drug and alcohol use cut short that dream. See, Report of Psychological Evaluation, p. 8.

Mr. Estrada's employment history began after he dropped out of high school. At the age of eighteen, Mr. Estrada secured a job as a camera man for a tow company. Thereafter, he worked as a security guard and as a barista for a coffee bar. See, Report of Psychological Evaluation, p. 8.

2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

First, what is the need to "protect the public from further crimes of the defendant"? The court has an obligation to consider "the nature and circumstances of the offense and the history and characteristics" of the defendant when imposing a sentence, including the risk of recidivism.

Mr. Estrada's original criminal behavior was summarized in the PSR at Document 156 para(s) 7-29, pp. 5-9.

Given this background, what kind of sentence can be fashioned to protect the public from further crimes of Mr. Estrada?

Let us look at the factors supporting sentencing options below the guideline calculation contained in the PSR and how these factors relate to the purpose of sentencing and the low risk of recidivism.

Drug Rehabilitation Reduces Recidivism. *U.S. v. Phinney,* 599 F.Supp.2d 1037 (E.D.Wis.,2009) (based on the defendant's age, lack of prior history, and progress in treatment programs thus far, district court concluded defendant was unlikely to re-offend. The Court disagreed with the guidelines' approach on possession pornography cases generally, and believed that defendant's treatment would be better achieved in a community-based program, and therefore sentenced the defendant to a period of six months custody followed by ten years of supervised release, despite that guidelines called for a 37-46 month sentence); *U.S. v. Perella*, 273 F.Supp.2d 162, 164 (D. Mass. 2003)(observing that if drug addiction creates a propensity to crime, drug rehabilitation goes a long way to preventing recidivism. Statistics suggest recidivism rate is less for drug offenders who receive treatment while in prison or jail, and still less for those treated outside of prison setting, citing Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders,* 53 Hastings L.J. 1217, 1220 (2002).

In the instant case, Mr. Estrada has an extensive history of addiction. Dr. Baranoski opined that one of the sentinel factors that shaped Mr. Estrada's development was his drug addiction, which began in mid-adolescence. See, Report of Psychological Evaluation, p. 3. Therefore, he could benefit from the "500 hour" Residential Drug Abuse Program ("RDAP") and the Nonresidential Drug Abuse Program with the goal of reducing the risk of recidivism. See, PSR, para(s). 119, pp. 22-23.

Age: Pursuant to USSG §5H1.1 (Policy Statement):

"A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems,

including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing."

The U.S. Sentencing Commission has found "recidivism rates decline relatively consistently as age increases." See *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* (May 2004). Post-*Booker* and *Rita*, a sentencing court may consider defendants' age under § 3553(a). *Gall v. U.S.*, 128 S. Ct. 586, 593, 599 (2007) (affirming sentence of probation, in part, for defendant's youth and immaturity at the time of the offense conduct).

In the instant case, Mr. Estrada is currently 22 years of age. Mr. Estrada was 21 years of age at the time of the August 25, 2024 offense. Dr. Baranoski evaluated Mr. Estrada at Hartford Correctional Center on September 18, 2025. She opined that:

"[a]t the time of the evaluation, he has been incarcerated for one year and shows marked immaturity and failure to achieve adult developmental landmarks related to social stability, future goals, stable housing, and work. His history and current behavior demonstrate the effects of incomplete brain development magnified by chronic drug use." See, Report of Psychological Evaluation, p. 14.

USPO Leone referenced Mr. Estrada's age as a departure factor for the Court's consideration:

"The Court may wish to consider a departure pursuant to USSG §5H1.1, to account for Mr. Estrada's youthfulness (age 21) at the time he committed the instant offense." See, PSR, para. 115, p. 22.

Given Mr. Estrada's age, Mr. Estrada requests that this Court consider a departure or a variance from the guideline range.

Mental & Emotional Condition: Pursuant to USSG, § 5H1.3, mental and emotional conditions may justify a departure from the sentencing guidelines if they are present to an unusual degree and distinguish the case from typical cases covered by the guidelines. Such conditions may also be relevant in determining the conditions of probation or supervised release, such as participation in a mental health program.

In the instant case, Mr. Estrada was evaluated by Dr. Madelon Baranoski. Her assessment of Mr. Estrada was that:

(1) His primary problem-solving approach was one of trial and error with a dependence on models of behavior which he adopted and repeated even when unsuccessful. He was impulsive and quick to respond without considering consequences.

(2) His personality structure was shaped by immaturity, borderline, and obsessive-compulsive characteristics. He has, however, been addicted to substances since mid-adolescence. His chronic addiction preceded the emergence of personality traits.

(3) His primary coping strategies were avoidance and fantasy. His avoidance included escape through drug use to avoid feelings of loss, anger, fear, worthlessness, and failure. His use of fantasy was evident in the past in his distraction by episodic experiences of having large sums of money and over-spending.

(4) His primary psychiatric disorder was polysubstance use disorder in remission because of incarceration.

(5) Although he showed antisocial behaviors, he did not meet criteria for antisocial personality disorder or psychopathy.

See, Report of Psychological Evaluation, pp. 15-16.

In Dr. Baranoski's opinion, "Mr. Estrada got caught up in a social group where drugs, alcohol, and the allure of fast money offered him a structure, - a damaging, dangerous, and illegal structure - for his otherwise empty, muddled, and confused life. He left school in the tenth grade and his home soon after. He was not ready for independence and lacked social skills, self-confidence, and capacity to manage on his own. His drug use made his life more complicated, disrupted his thinking, eroded judgment, and linked him to social environments that modeled destructive behaviors." See, Report of Psychological Evaluation, pp. 16-17.

Based upon the above, Dr. Baranoski recommended that "Mr. Estrada be referred for a psychiatric assessment for depression and monitoring for self-harm because his risk of suicide is elevated because of his past attempts and history of depression." She noted that "he will be particularly vulnerable to depression if he receives distressing news about his parents, who are his primary social and emotional attachments." See, Report of Psychological Evaluation, p. 17.

Given Mr. Estrada's mental and emotional condition, Mr. Estrada requests that this Court consider a departure or a variance from the guideline range.

<u>Downward Departure for Time Spent in State Custody</u>: Federal courts may grant downward departures under the Sentencing Guidelines to account for time spent in state custody that cannot be credited under § 3585(b). For example, in *U.S. v. Rosado*,

254 F.Supp. 2d 316 (2003) the court granted a discretionary downward departure to account for seven months the defendant spent in state custody, reasoning that the defendant should not be penalized for successfully completing a state shock incarceration program and receiving early parole.

The Sentencing Guidelines, specifically § 5G1.3(b), allow for adjustments to federal sentences when the court determines that time served on an undischarged term of imprisonment will not be credited by the BOP.

In the instant case, Mr. Estrada requests that this Court depart downward to account for time served in state pretrial custody. Mr. Estrada was arrested on August 26, 2024. To date, he remains in state pretrial custody. Defense counsel has spoken with Mr. Estrada's state defender, who indicated that the State's Attorney may very "nolle" Mr. Estrada's state case once all defendants in the instant federal case are sentenced. Despite any future "nolle," it remains unclear as to whether the BOP will credit state time served by Mr. Estrada from August 26, 2024 to November 3, 2025 (14 months and 8 days). Therefore, Mr. Estrada requests that this Court grant a downward departure per USSG § 5G1.3(b).

<u>Rehabilitation</u>:  Pursuant to Section 3553, this court must consider the factor of rehabilitation. A Guideline sentence in this case gives short shrift to the statutorily mandated purpose of sentencing, namely rehabilitation. As stated by Judge Hellerstein:

> Rehabilitation is also a goal of sentencing. 18 U.S.C. Sections 3553(a) (2) (D). That goal cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge

should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment.

Carvajal, 2005 U.S. Dist. LEXIS 3076, at *15-16.

In the instant case, Mr. Estrada articulated his desire to rehabilitate his life. USPO Leone wrote that:

"Mr. Estrada described himself as family person, and a hard worker. He reported that his future goal is to start his own family and be a provider through obtaining a career, possibly start his own business. Mr. Estrada reported that he no longer desires to engage in drug use again and referred to his drug use as 'very stupid.' He reported that he enjoys the feelings of being sober, having a clean mind and being less 'emotional.'" See, PSR, para. 82, pp. 17-18.

General Deterrence: The consideration of general deterrence, required under Section 3553(a)(2)(B), mandates that the Court consider the extent to which similarly situated potential offenders will be deterred from committing similar crimes by whatever sentence the Court imposes in this case. This is, however, a highly unpredictable exercise: it assumes that a person in defendant's position considering whether to commit a crime weighs the consequences of getting caught and further weighs the benefits against the incremental risks of prison sentences of terms. However, most persons would not commit the crime at all if they thought that they would be caught, regardless of the punishment Further, it is impossible to conclude that somewhere along the range of "just" punishments there is a tipping point, a point beyond which a rational potential offender will conclude not to become involved in that offense due to the sentence for this offense.

"The certainty of being caught is a vastly more powerful deterrent than the

punishment." *National Institute of Justice, Five Things About Deterrence* (Sept. 2014) *http://www.nij.gov/five-things/pages/deterrence.aspx*. "Sending an offender to prison isn't a very effective way to deter crime." *https://ncjrs.gov/pdffiles1/nij/247350.pdf*. Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crimes. Prisons may have the opposite effect." Id.

"[T] here is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs." *Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013).* "[L] engthy prison sentences cannot be justified on a deterrence-based, crime prevention basis." Id. at 202. "[E] vidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment . . .. The evidence in support of certainty's deterrent effect pertains exclusively to apprehension probability. Consequently, the conclusion that certainty, not severity, is the more effective deterrent is more precisely stated as certainty of apprehension and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent . . .. Thus, this revised conclusion about the deterrent effect of punishment certainly should not be construed as implying that policies mandating severe legal consequences have been demonstrated to achieve deterrent effects." Id. at 201-202.

In the case at bar, there is no evidence that sentencing Mr. Estrada to a guideline prison sentence will yield a general deterrent effect. Instead, the fact that

he was arrested and held accountable for his actions will yield a far greater general deterrent effect than any lengthy prison sentence.

**Specific Deterrence**: As for specific deterrence, "[t] here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation." *Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013).*

"[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect." *Ellen Raaijmakers et al., Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory, 54 J. of Research in Crime and Delinquency 1, 4 (2017).*

In the case at bar, the imprisonment of Mr. Estrada will remove him from society for a period of time. However, a sentence that de-emphasizes time in prison and emphasizes drug rehabilitation, mental health treatment, further education, and vocational training will produce the specific deterrence contemplated by Section 3553.

3. The kinds of sentences available and 4. Sentencing Guidelines range.

This subject has already been discussed. See, PSR, para(s). 92-112, pp. 19-21.

In <u>United States v. Ranum</u>, 353 F. Supp. 2d 984, 986 (B.D. Wis. 2005), Judge Adelman concluded that the Guidelines are not presumptive, but are truly advisory, and should be treated as one factor to be considered in conjunction with other factors

that Congress enumerated in § 3553(a). Judge Pratt followed <u>Ranum</u> in <u>United States v. Myers</u>, 353 F. Supp. 2d 1026, 1029-30 (S.D. Iowa 2005):

> At first blush, a system of discretionary sentencing would appear to invite what Congress hoped to avoid, unfairness at sentencing. The Supreme Court in <u>Booker</u>, however, reminded judges and the public that true uniformity exists not in a one-size-fits-all scheme, but in "similar relationships between sentence and real conduct." 125 S. Ct. 738, at 21. This is the guiding principle at work in <u>Booker</u>. This Court will endeavor, then, to square the real conduct presented by the evidence presented concerning a defendant, with the public interests expressed through the sentencing statute, to deliver a judgment in a manner as even-handed and reasonable as humanly possible.

*Id.* See also, <u>United States v. West</u>, 2005 U.S. Dist. LEXIS 1123, at *6-*7 (S.D.N.Y. Jan. 27, 2005) (Sweet, J.) ("The Guidelines calculations are to be treated 'as just one of a number of sentencing factors' in part because several of the factors identified in Section 3553(a) conflict with prescriptions and proscriptions of Guidelines, and that such conflicts will require resolution by district courts"); <u>United States v. Jones</u>, 352 F. Supp. 2d 22,26 (D. Me. 2005) (reviewing factors identified in Section 3553(a) "in determining whether to apply the now advisory Guidelines" and concluding that Guidelines would not be followed under the circumstances); <u>United States v. Jaber</u>, 362 F. Supp. 2d 365 (D. Mass. 2005); <u>United States v. Moreland</u>, 2005 U.S. Dist. LEXIS 7393, at *3-*4 (S.D.W. Va. Apr. 27, 2005); <u>Simon v. United States</u>, 361 F. Supp. 2d 35, 40 {S.D.N.Y. 2005) {Sifton, J.) ("I adopt the view that the Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by Section 3553{a), in part because Section 3553(a) does not distinguish between the weight to be given to any of the factors listed, so that giving 'heavy'

weight to the Guidelines may therefore be in tension, if not conflict, with Section 3553(a)'s command to consider a multitude of factors").

### 5. Policy Statements.

Any policy statements that the Court should consider relating to this case are contained within the content of this memorandum.

6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### 7. Restitution.

Restitution is pending. See, PSR, para. 109, p. 21.

## CONCLUSION

It is respectfully requested that this Court impose a sentence that is "no more than necessary" to further the principles set forth in § 3553(a). If this Court decides to impose a term of imprisonment, Mr. Estrada requests that this Court recommend to the FBOP a designation to a facility as close as possible to Miami, Florida as well as placement into RDAP and/or the other FBOP Programming mentioned in the PSR, para(s). 119, pp. 22-23.

Respectfully Submitted,

DEFENDANT, RICARDO ESTRADA,

By: */s/ David J. Wenc*

David J. Wenc
Wenc Law Firm, LLC
184 Dusky Lane
Suffield, CT 06078
Tel. (860) 371-663
Federal Bar#:  CT 00089
DWenc@wenclawfirmllc.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2025, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail to anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing including the individuals listed below. Parties may access this filing through the Court's CM/ECF System.

By: */s/ David J. Wenc*

David J. Wenc
Wenc Law Firm, LLC
184 Dusky Lane
Suffield, CT 06078
Tel. (860) 371-663
Federal Bar#:  CT 00089
DWenc@wenclawfirmllc.com