UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 3:24CR186(SVN) |
| RICARDO ESTRADA | : | October 27, 2025 |


**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully submits this memorandum in advance of defendant Ricardo Estrada's sentencing, currently scheduled for November 3, 2025 at 2:00 P.M. As this Court is aware, the defendant's crime is one of the most serious and dangerous offenses under federal law, as evidenced by its maximum sentence of life imprisonment. The crimes charged against this defendant involved extended premeditation and planning, days of stalking the victims, an enthusiasm for extreme violence, and the willingness to inflict both physical and psychological trauma. The motivation of the defendant and his co-conspirators was greed through the exploitation of those seen as particularly vulnerable. Given the facts and circumstances of this case and this defendant, the factors that bear on the sentence weigh in favor of a substantial term of imprisonment here, one at least within the range set forth in the plea agreement and Presentence Report.

## I.     PROCEDURAL BACKGROUND

On August 26, 2025, at the Airbnb residence in Roxbury, Connecticut that had been rented for the benefit of the defendant and his co-conspirators, Danbury Police detectives arrested the defendant and Michael Rivas on assorted state charges. The defendant, along with Rivas, had fled the scene of the violent abduction of the victims after police had been alerted and responded to the crime. Through various avenues of investigation, detectives and FBI special agents located the defendant and Rivas in Roxbury in the hours after the arrest of their

compatriots and took them into custody. *See* Presentence Report ("PSR") at 13, ¶ 59. On September 11, 2024, the defendant and his co-conspirators were arrested on a federal criminal complaint and presented before United States Magistrate Judge S. Dave Vatti. The magistrate ordered the defendant detained. Doc. Nos. 7 & 9.  On September 24, 2024, a federal grand jury charged the defendant with conspiracy, carjacking, and kidnapping, Doc. 17, and he entered a guilty plea to Counts One (conspiracy) and Three (kidnapping), pursuant to a plea agreement, Doc. 68, on February 11, 2025. The Probation Office prepared a draft Presentence Report on April 11, 2025, Doc. 108, and the parties provided comments and objections. Thereafter, on August 11, 2025 the final Presentence Report was filed. Doc. 156, followed by the second and third addenda. Doc. 161, 177. The defendant filed a sentencing memorandum on October 20, 2025. As noted above, the defendant is scheduled for sentencing on November 3, 2025.

**II.    THE PLEA AGREEMENT AND THE PRESENTENCE REPORT**

As to the calculation of the Sentencing Guidelines, the plea agreement executed by the parties and the Presentence Report agree. *See* Doc 68 at 4-5; PSR at 10-12, ¶¶ 33-52. For the kidnapping, the base offense level under U.S.S.G. § 2A4.1(a) is 32. Two enhancements were applied -- two levels for the serious bodily injury sustained by a victim (U.S.S.G. § 2A4.1(b)(2)(B)), and another two levels for the use of a dangerous weapon (U.S.S.G. § 2A4.1(b)(3)), in this case, metal baseball bats, leading to an adjusted offense level of 36. Assuming the defendant meets the conditions set forth in the plea agreement (at page 4), the offense level would decrease by three, resulting in a total offense level of 33. Doc. 68 at 4. The parties and the Probation Office placed the defendant in Criminal History Category I, Doc. 68 at 5, PSR at 12, ¶ 56; in that category, with an offense level of 33, the sentencing range is 135 to 168 months of imprisonment.  Doc. 68 at 5, PSR at 19, ¶ 93.

### III.   ARGUMENT

As the Court is well aware, 18 U.S.C. § 3553(a) provides that "[t]he court, in determining the particular sentence to be imposed, shall consider":

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed—

    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)   to afford adequate deterrence to criminal conduct;

    (C)   to protect the public from further crimes of the defendant; and

    (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)   any pertinent policy statement [issued by the Sentencing Commission];

(6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)   the need to provide restitution to any victims of the offense.

The Government addresses the weight of these factors below.

### A.   <u>Providing Just Punishment -- The Nature, Circumstances and Seriousness of the Offense and the Defendant's History</u>

This case involves a deliberative, deeply disturbing, and exceedingly violent crime, the kind of crime that strikes fear, not only in the victims who suffered directly, but also in the public at large as it evinces an utter contempt for the constraints of the law and the norms of society, and a callous disregard for the safety of others. The two victims, a middle-

aged married couple, were driving around their town doing errands for hours on August 25, 2024, unaware that they were being followed and photographed in preparation for their imminent violent abduction. Also unbeknownst to them, their home had been staked out for two days before that and their locations mapped and disseminated among the conspirators to find the optimal place to grab them. All the conspirators were ready to employ extreme physical violence against them and against their son. Ultimately, when the defendant and his compatriots abducted the victims, it was in the middle of a public street during daylight hours. The couple was surrounded by six males, all dressed in dark clothing, all donning masks and carrying baseball bats. The conspirators crashed into the victim's car, boxed them in using three vehicles, dragged them out and onto the street, assaulted them with fists and the bats, incapacitated them with duct tape and ropes, threw them into the back of a van, assaulted them further, and repeatedly threatened their lives if their son did not do as he was told. Not surprisingly, the victims suffered both physical trauma and extreme mental anguish, the latter continuing to the present day. In addition to that suffering, the consequences of this crime for the victims have been far-reaching. The male victim lost his job due to the publicity surrounding this case and his son, and their residency status in this country, dependent on the male victim's employment, is uncertain and likely in jeopardy. What is abundantly clear is that few crimes are more dangerous and damaging than the one committed by the defendant and his compatriots in this case.

In his interview with Madelon Baranoksi, an examiner hired by the defense, the defendant apparently downplayed his role in the crimes, suggesting that he did not take part in the violent aspects of the carjacking and kidnapping. *See* Baranoski Report at 2. But the evidence shows otherwise. First, on the day of their kidnapping, the victims told police

that they were surrounded by 6 or 7 males, all wearing black with black face masks. PSR at 6, ¶ 15. The male victim stated that, when he was attempting to resist before being thrown into the van, several suspects began to punch him in the face and hit him with baseball bats. *Id.* at ¶ 16. The conspirators, including the defendant, were six in number, and each was on scene at the time of the abduction. The white Honda Civic crashed into the back of the victims' SUV, the Nissan Sentra was used to box in the victims' vehicle on one side, and the Promaster van was used similarly on the other side. After they had struck the victims' SUV, the defendant and the others got out of their respective vehicles, surrounded the victims, and then grabbed and assaulted them. Once the victims had been thrown into the back of the van, the defendant got into their Lamborghini (as shown on video) and drove it from the scene. PSR at 7, ¶ 21 & 8, ¶ 25. Thus, there is every reason to believe that the defendant was involved directly in the hands-on, violent aspects of the crimes. That conclusion is bolstered by the fact that, when police discovered the Lamborghini off the roadway on East King Street thereafter, they found a baseball bat with traces of blood on it in the front seat. *See* Exhibit at 13-15. As the defendant was the only conspirator who drove the victims' vehicle, he was the one armed with that blood-stained bat when he got into that SUV.  Further, a bat was also found in the other vehicle the defendant occupied after the kidnapping: the Honda Civic. *See* Exhibit at 11-12. The defendant and Michael Rivas drove the Civic to the Roxbury Airbnb rental when they fled from police. PSR at 9, ¶¶ 27-28. The police found the car – with a baseball bat inside – and the defendant at that location in the hours after the kidnapping. *Id.* They also found masks and ropes, like the ones found in the van and consistent with the description given by the victims. *Id.* at ¶ 29.

Thus, the evidence shows that the defendant was in the thick of the violence against the victims here, contrary to his statements to or the assumptions of his evaluator.

Moreover, the evidence gathered by agents shows that the defendant was the original person Borrero intended to summon to commit these crimes with him, someone he believed would be a ready participant. After Borrero arrived in Connecticut and conducted surveillance of the victims at the behest of those who had planned the conspiracy, he was asked if he were willing to do more, specifically, if he were willing to rob or extort the victims' son, and in the course of doing so, kidnap the victims if deemed necessary. Borrero was more than willing, but he knew he needed help. He indicated in a Telegram message that he had someone in particular in mind for the job -- *"I got someone who is down to come and he's been on missions with me already."* Exhibit at 1. When he got the green light to bring someone else into the scheme, the first person he called was the defendant.[1] Of note as far as the defendant's prior involvement with Borrero, both men have an active warrant out of Miami for two counts of armed robbery, armed carjacking, and aggravated battery causing bodily harm arising out of the same incident. *See* PSR at 12, ¶ 57.[2]

That the defendant had a history with Borrero in crypto-related crime was indicated as well by what he told Dr. Baranoski. He mentioned making a lot of money through Bitcoin "trading," but, according to the report, "Mr. Estrada would not answer explicit questions about exactly what the work was." Baranoksi Report at 7. What he did say was that he participated in this crpyto-activity with his co-defendants, *id.,* that "bitcoin is a

---

[1] Special Agent Matthew Loucks reviewed the contents of Borrero's phone and determined that, shortly after the messages above, Borrero's phone made a call over FaceTime to the defendant's phone. Thereafter, he called the others.

[2] Borrero's draft Presentence Report includes an active warrant for the same charges.

violent business," and that "kidnapping for code happens all the time in Miami," without elaborating further. *Id.* He also elected not to talk to her about the warrant out of Miami for robbery, carjacking, and aggravated battery. *Id.* at 11.

The defendant's criminal record demonstrates that he is no stranger to violence or the criminal justice system.  In addition to the active warrant issued in January 2025 for violent crimes, infliction of bodily harm, and a weapons-related offense, the defendant was arrested for a strongarm robbery and battery against a female two months before his arrest in the instant case. PSR at 14, ¶ 62. Further, in 2021, he was arrested for carrying a concealed weapon. *Id.* at 14, ¶ 61. These charges were dropped, leaving him eligible for diversion when he was arrested for trespassing at an elementary school around midnight and fleeing from police. *Id.* 12-13, ¶ 58. But his arrest in the instant case is the latest in a string of arrests from 2024, with all but one involving violence. *Id.* at 12-14. As the Probation Officer noted, an arrest history like this defendant's "raises concerns" about the dangers posed by him and his risk of recidivism. PSR at 24, ¶ 124.

An important factor that bears on the sentence – and one not mentioned in the defendant's memorandum -- is just punishment for the defendant's crimes. 18 U.S.C. § 3553(a)(2)(A). The defendant and his associates had plenty of opportunities to turn away from committing these crimes. They were thousands of miles away from the victims and had to decide to fly here in the first place.[3] Once here, they literally spent hours watching, waiting, and discussing what they would do. At any point during that time, any one of them could have expressed reluctance, pointed out reasons for desisting, and refused to go through with the plan.  But no one did that, including this defendant. Indeed, no one had

---

[3] Indeed, after the defendant missed the first flight, he came back to the airport the next morning to catch another.

any difficulty whatsoever with brutally attacking and terrorizing a middle-aged couple they did not know for what they hoped would be a significant payout. In fact, had this job gone as planned, the group was eager to continue on to California where additional targets lived. *See* Exhibit at 3. The need to justly punish this brazen and horrific crime and the defendant's eager participation in it weigh heavily in favor of a very significant sentence.

The defendant also is dismissive of the Sentencing Guidelines as a benchmark for what an appropriate sentence would be in this case. But the Guidelines take into account explicitly the physical injury inflicted on the victims, the use of dangerous weapons, the lack of prior convictions on the part of the defendant, and the defendant's acceptance of responsibility, after the fact, for the crimes he committed. What the Guidelines do not account for is the victims' extreme and continuing mental anguish resulting from the crimes the defendant and his compatriots committed, and the truly devastating fallout they've experienced due to the loss of their vocation and livelihood and the very real possibility of losing their place in this country. Neither do they account for the defendant's pattern of violent conduct leading up to the instant crime. Those circumstances suggest the Guidelines are too low rather than too high.

In arguing for a below-Guidelines sentence, the defense raises the defendant's use of drugs and alcohol, his age, his mental and emotional conditions, his desire to rehabilitate, and the time he has spent in state custody on related state charges. As to the last, according to the Bureau of Prisons, the defendant will be credited for all time spent in custody that is not credited to another sentence. As we anticipate the related state charges will be nolle'd after his federal sentence is imposed, the time he has been in custody will not have been applied to any other sentence; therefore, he will receive full credit for his time in jail since

his August 2024 arrest and detention. Any variance based on the assumption that he will not receive credit would be doubling the credit he already will receive.

As to the defendant's background and personal circumstances, his are much better than that of many criminal defendants. The PSR describes his upbringing as the only child of an intact family, with both parents in the home and participating in his life. PSR at 15, ¶¶ 64-66. His parents were employed and provided for him, and he suffered no abuse or neglect at their hands. *Id.* at ¶ 69. They wanted him to have opportunities, and he acted against their wishes when he elected to quit the magnet high school he was attending because of his desire to make money. *Id.* at 18, ¶ 83. He was able to secure employment at various places after he left school, including managing an expresso bar and working security for private events. *Id.* at ¶¶ 86-87. His employment background suggests he was capable and readily employable.[4]

But legitimate employment apparently was not enough -- greed certainly played a role in the defendant's decision to engage in crypto-related activities and crime. He refused to explain what he was doing in that regard to his evaluator, *see* Baranoski Report at 7, and his reticence, combined with his participation in such activities with his co-conspirators in this case, lead to the conclusion that his Bitcoin conduct was criminal in nature. He suggests his peer group influenced his decision to commit crime, including his use of illegal substances. While peer influence and drug use may have contributed to his choices, that circumstance is not at all atypical. Many criminal defendants are influenced by peers. (Indeed, many people outside the criminal justice system are so influenced.) Moreover, many defendants use drugs. As the Sentencing Guidelines state, "Substance abuse is highly

---

[4] Dr. Baranoski's report (at 13) suggests the same. (Defendant in the average range of function across most intellectual areas.)

correlated to an increased propensity to commit crime." U.S.S.G. § 5H1.4. Drug use and crime often go hand-in-hand. For that reason, drug abuse is not a reason for a lesser sentence ordinarily. *Id.* And the defendant's is not an extraordinary case.

His mental and emotional conditions do not make his case extraordinary either. Dr. Baranoski's evaluation included a diagnosis of substance abuse and alcohol abuse as she was unable to diagnose any personality disorder. Report at 15. The defendant did not meet the criteria for anti-social personality disorder or psychopathy. *Id.* at 16. Rather, her conclusion was that his social network – his peer group – contributed to the decisions he made. *Id.* As noted above, the influence of friends is a very common circumstance in criminal cases, especially those involving a conspiracy like this one. It does not remove the defendant's case from the norm to justify a lower sentence than that called for by the Guidelines.

Concerning Dr. Baranoski's report, the Government has several concerns about its utility. Such evaluations are becoming the norm in many criminal sentencings, and yet the defense here, like the defense in other sentencings, did not provide any disclosures that bear upon the credibility of the report and the examiner. The Government did not receive a resume, any information about the fee arrangement, any reference to prior testimony she may have given, whether she has an ongoing relationship with defense counsel specifically or the defense bar more generally, or whether she typically testifies on behalf of defendants. She did not reach out to the Government or seek information from us, and her assumptions about the defendant's involvement in the case are based on inaccurate or incomplete information. Neither did the defense provide us with the records she reviewed which

appeared fairly limited (and were listed inaccurately in the report[5]). She did not seek any educational records, for example, or any medical records beyond those from the Connecticut Department of Corrections. The only person she spoke with is the defendant himself and that was on one occasion only. We mean no disrespect to Dr. Baranoski, but there are reasons why this evaluation adds little to the PSR and seems meant to put the imprimatur of an expert on information provided by the defendant.

As far as the defendant's age as a reason for a lesser sentence, the defendant's history cuts against any finding that he was incapable of making a reasoned choice in this case. Information in the PSR shows a consistent employment record after he left school. He not only remained at the job he had with AFA Towing and Recovery for 18 months but also got his security license and began to work as a security officer at the same time. PSR at 18, ¶¶ 85-86. The next year, he was hired at an expresso bar and ultimately was promoted to manager, while still taking security jobs to make more money. *Id.* at ¶ 87. This track record suggests that the defendant is capable of making informed and responsible decisions. The choice to travel from Florida to Connecticut to participate in what appeared to be a lucrative kidnapping scheme may not have been a lawful choice, but the defendant's circumstances indicate that he certainly was capable of weighing the odds and acting with reason and rationality when he made it. Indeed, trying to rob or extort stolen Bitcoin from the person who stole it originally and is therefore unable to call on law enforcement for help is an exceedingly rational act.

While the Sentencing Guidelines indicate that age may, in some circumstances, be relevant to a decision to depart from the applicable range, the relevance is qualified – only

---

[5] She lists Department of Corrections medical records from Manson Youth Institute from March 2024. The defendant was not in Connecticut until his arrest at the end of August 2024.

in the "appropriate case" where "a form of punishment other than prison might be sufficient to meet the purposes of sentencing" should the Court consider a lesser sentence. *See* U.S.S.G. § 5H1.1. Here, given the nature of the crime, the harm caused to the victims, the need for the imposition of just punishment, and the other goals a sentence must serve (as discussed below), this case is not one where a lesser prison sentence is appropriate.

B. The Need to Promote Respect for the Law, to Provide Adequate Deterrence, and to Protect the Public

Each of these factors weighs heavily in favor of a sentence within the Guideline range. There are others inclined to engage in criminal activity like the defendant's for reasons similar to his. In fact, the defendant told Dr. Baranoski that kidnappings "for a code" happen "all the time" in Miami. Report at 7. The crypto-world is a bit like the Wild West, and victims like the ones in this case are seen as easy targets. The financial rewards are believed to be quite high, as demonstrated by these defendants' readiness to get on a plane when summoned and spend days in a place they'd never been. Moreover, the prospect of substantial reward exponentially increases the risk of violence. A significant sentence of imprisonment would show that the consequences of engaging in this type of criminal activity are severe. The sentence here will serve as a much-needed wakeup call, not only to the defendants in this case but to others who are monitoring it. And many people are monitoring what happens in this case.

Moreover, the defendant's prior arrest record, and his involvement in criminal conduct for which he has not been arrested, shows that he needs to be deterred from committing crime, and that the community needs protecting from him. Cases against him have been dropped or diverted, and he has continued to inflict violence on others. Thus, the objectives of specific deterrence and of protecting the public are best served by a sentence commensurate with the crimes here.

Accordingly, the Government submits that the need for specific and general deterrence, to promote respect for the law, and to protect the public from future crime weigh strongly in favor of a sentence within the Guideline range set forth in the plea agreement and the PSR.

C. The Need to Provide the Defendant with Training, Medical Care, or Treatment

The defendant to the Probation Office and through Dr. Baranoski reports the use of alcohol and various controlled substances. PSR at 16-17; Baranoski Report at 9-10. As the PSR indicates (at 22-23, ¶ 119), the Bureau of Prisons has several programs that are designed to address these issues and enable the defendant to place himself in a better, more stable condition, should he avail himself of the opportunities he'll have. An extended opportunity to participate in BOP programs in a restricted and supervised environment may be the defendant's best chance to reverse course and change his life for the better if that is what he wants to do.  The structure offered by BOP may well increase the likelihood that the defendant will participate in treatment in a sustained way.

D. The Need to Avoid Disparate Sentences

Courts seek to avoid nationwide sentencing disparities for similar crimes and similar criminals. *United States v. Saez,* 444 F.3d 15, 18 & n. 2 (1st Cir. 2006) (citing cases). Defendants similarly situated to this defendant – having committed a violent kidnapping and carjacking, causing serious injury and lasting distress -- should and would be facing substantial prison sentences, consistent with the applicable Guidelines range.[6] Thus, the need to avoid sentencing disparities weighs in favor of sentencing the defendant within that range.

---

[6] The PSR reports that, over the last five years, the average sentence for kidnapping (Level 33) for defendants in Criminal History Category I was 156 months. This information provides some nationwide data, based on sentences imposed on 10 defendants.

<u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the facts of this case, the circumstances of this defendant, the sentencing factors set forth in 18 U.S.C. § 3553(a), and the law governing sentencing all fully support a sentence of imprisonment at least as high as the range provided in the plea agreement and the Presentence Report.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

/s/

KAREN L. PECK
ASSISTANT U.S. ATTORNEY
Fed Bar No. CT14959
1000 Lafayette Blvd, 10th Floor
Bridgeport, CT 06604
(203) 696-3000
Karen.Peck@usdoj.gov

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 27, 2025, a copy of the foregoing Government's Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____//s//_____
KAREN L. PECK
ASSISTANT UNITED STATES ATTORNEY