UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                        :
UNITED STATES OF AMERICA     :  No. 3:24CR186(SVN)
                        :
       v.             :
                        :
ANTHONY PENA,          :
                        :  Hartford, Connecticut
           Defendant   :  May 14, 2025
                        :
- - - - - - - - - - - - - - - - - x

<u>SENTENCING</u>

BEFORE:

THE HONORABLE SARALA V. NAGALA, U.S.D.J.

APPEARANCES:

FOR THE GOVERNMENT:

OFFICE OF THE UNITED STATES ATTORNEY
    1000 Lafayette Boulevard, Tenth Floor
    Bridgeport,  Connecticut 06640
BY:  KAREN L. PECK, AUSA

FOR THE DEFENDANT:

SHEEHAN & REEVE
    350 Orange Street
    Suite 101
    New Haven, Connecticut 06511
BY:  MICHAEL O. SHEEHAN, ESQ.

Diana Huntington, RDR, CRR
Official Court Reporter

**2:01 P.M.**

THE COURT:  Good afternoon.  We're here in Case No. 24CR186, United States of America v. Anthony Pena.  Let's begin with appearance and please introduce anyone at your table with you.

MS. PECK:  Good afternoon, Your Honor.  Here for the government is Assistant U.S. Attorney Karen Peck.  With me at counsel table is the case agent, Special Agent Matthew Loucks of the FBI.

THE COURT:  Good afternoon to both of you.

MR. SHEEHAN:  Good afternoon, Your Honor.  Michael Sheehan for Mr. Pena who is sitting next to me.  And in the courtroom are Mr. Pena's father Michael Borrero, his mother Janelle, his sister -- I got to get these names right here.  Jenise is his mom, sister is Janelle, and brother is Jonathan.  They've come up from Florida for the sentencing.

THE COURT:  Could I have you just move the microphone a little closer, Attorney Sheehan?

MR. SHEEHAN:  Yes.

THE COURT:  Thank you, that's better.

MR. SHEEHAN:  Do you want me to repeat that or we're okay?

THE COURT:  We're okay.  Good afternoon to you, Attorney Sheehan.  Good afternoon to you, Mr. Pena.  And

good afternoon to Mr. Pena's family members.

I'll also note for the record that Officer Leone of the Probation Office who authored the Presentence Report is present here as well.

Now, Attorney Peck, I understand that there are persons who have rights in regard to this proceeding under the Crime Victims Rights Act.  Have the government's victim notification obligations been met for today's proceeding?

MS. PECK:  They have been, Your Honor.

THE COURT:  And I understand you may have a written statement from a victim that you would like to read.  I'll have you do that before counsel presents arguments as to an appropriate sentence.

MS. PECK:  That's fine, Your Honor.

THE COURT:  Thank you.

Okay.  So, Mr. Pena, let me explain how things will proceed this afternoon.  The first part of what I need to do at a sentencing hearing is somewhat legal and technical.  I go through the procedural history of the case briefly and discuss first what I have reviewed in advance of today's sentencing because I want to make sure that I've read everything that the lawyers think I should have read to prepare for this hearing.  Then I'll turn to asking you and your attorney and then the prosecutor if

you all have read and reviewed the Presentence Report prepared by the Probation Office.  I will then do some technical calculations under the U.S. Sentencing Guidelines Manual and decide the Sentencing Guidelines range that applies here.  And that will cover the technical matters.

Then I will turn to hearing from the lawyers about what they believe an appropriate sentence is in this case.  As part of that, I'll hear from the victim through the statement that Attorney Peck has said she would like to read.  You are also entitled to make a statement at this sentencing if you wish, but you should know that doing so is not required, so I leave that to you.

After I hear the arguments of the parties I will go through the relevant factors that a court must consider in deciding an appropriate sentence and explain how they're weighing on my mind as I choose a particular sentence for you.

Finally, at the very end I will pronounce sentence.

With that explanation in mind, are you ready to proceed?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So with respect to procedural history, Mr. Pena appeared before me on January 10th of

this year and entered a guilty plea to two counts of the operative indictment, Counts One and Three.  They charged him with conspiracy and kidnapping, respectively.  A Presentence Report was prepared for the Court by the U.S. Probation Office, and the final report was dated April 21, 2025.

In advance of today's sentencing, I have reviewed the PSR, I've reviewed defendant's sentencing memorandum, and I've reviewed the government's sentencing memorandum including its sealed exhibits.

Attorney Peck, starting with you, is there anything additional that I haven't mentioned here that you think I should have reviewed?

MS. PECK:  No, Your Honor.

THE COURT:  Attorney Sheehan, same question?

MR. SHEEHAN:  I think you read -- you didn't mention my reply memo.

THE COURT:  Let me make sure.

MR. SHEEHAN:  It's not very long.

THE COURT:  I apologize.  I don't recall seeing it.  Let me review it right now.

MR. SHEEHAN:  It is Docket #127.  I can hand a copy up to the Court.

THE COURT:  Is it an extra?

MR. SHEEHAN:  It's mine.

THE COURT:  I can pull it up online so then you can have it with you.

MR. SHEEHAN:  Thank you.  It's Docket #127.

MS. PECK:  Can I look at it a minute?  I don't think I saw it either.

MR. SHEEHAN:  I guess nobody got it.

THE COURT:  I apologize for that.

MR. SHEEHAN:  No, no, no.  The government didn't get it either.  Maybe it just was one of those funny, odd things that happens.

THE COURT:  I do see it on the docket.  Again, I apologize.

MR. SHEEHAN:  It's all of two pages.  Hoping that brevity gets me somewhere, Your Honor.

THE COURT:  Okay.  I have now read it and, again, I apologize for not mentioning that.  But it's now on my mind.  Okay.

Attorney Sheehan, have you read the Presentence Report?

MR. SHEEHAN:  I have, Your Honor.

THE COURT:  Did you go over it with your client?

MR. SHEEHAN:  I did.

THE COURT:  Do you believe he understood it?

MR. SHEEHAN:  I do.

THE COURT:  And do you have any objections to

the factual statements therein?

MR. SHEEHAN:  No, Your Honor.

THE COURT:  All right.

Mr. Pena, have you read the Presentence Report?

THE DEFENDANT:  Yes, I have, Your Honor.

THE COURT:  Did you go over it with your lawyer?

THE DEFENDANT:  Yes, I have.

THE COURT:  Did you provide him any comments that you had on it if you spotted something that was in error?

THE DEFENDANT:  There were no errors.

THE COURT:  Okay.  Attorney, Sheehan, I understand that you may be making a request to have the paragraph about Mr. Pena's education reflect that he's currently in GED classes; is that correct?

MR. SHEEHAN:  Yes, Your Honor.  And I have provided Probation and the government with a notice that I received from the New Haven Correctional Center about he's in active pursuit of his GED.  I ask that be included in the Presentence Report as it may impact on his classification, among other things, but it will also put him on the road to continuing in that progress.

THE COURT:  Attorney Peck, is there any objection to modifying paragraph 80 of the PSR which now says Mr. Pena has not obtained his GED to saying Mr. Pena

has engaged in classes toward his GED?

MS. PECK:  There's no objection, Your Honor.

THE COURT:  Officer Leone will edit paragraph 80 to do that.

THE PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  Thank you.

Attorney Peck, have you read the Presentence Report?

MS. PECK:  I have, Your Honor.

THE COURT:  Do you have any objections to the factual statements in it?

MS. PECK:  I do not.

THE COURT:  Thank you.

Being that there are no objections to the factual statements of the PSR, I will adopt the factual statements of the PSR as my findings of fact in the case and I'll order only that one change to paragraph 80 regarding Mr. Pena's GED classes.

Moving forward then, with respect to the penalties that could apply here, let me first announce what I understand to be the statutory maximum penalties that are allowed under the statutes under which Mr. Pena was convicted.

First, for Count One, the maximum penalties that can be imposed are as follows:  Five years of

imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

For Count Three, the kidnapping count, there is a maximum penalty of life in prison, a maximum supervised release term of five years, a maximum fine of $250,000, and a $100 special assessment.

Now, those are the statutory maximums, Mr. Pena.

One other thing that I need to calculate in order to consider it as part of my sentencing assessment is something called the calculation under the Sentencing Guidelines Manual.  The Sentencing Guidelines Manual is a book of advice published by the U.S. Sentencing Commission that provides guidance or recommendations on what could be a fair and just sentence in your particular case by looking at a whole host of things.  It looks at the type of offense involved; some of the characteristics that might have accompanied that offense; the criminal record that you might have, if any; and a variety of other factors.  The end result of calculating the guidelines results in a number of ranges, usually a range of months of imprisonment or years of probation, a range of years of supervised release, and a range of a monetary fine, and all of those are ranges, again, that the Sentencing Commission believes could be appropriate in your case.

Importantly, I am not bound by those ranges,

meaning I don't have to give you a sentence within those ranges, but I do have an obligation to figure out what the ranges are and to consider those ranges along with a number of other factors when I sentence you.  So I'm going to proceed with calculating the guidelines range now.

First, does the government move for awarding Mr. Pena the third point for acceptance of responsibility?

MS. PECK:  We do, Your Honor.

THE COURT:  That motion is granted.

Now, it doesn't appear that there are any disputes between the parties, at least from your sentencing submissions, with respect to how the PSR calculates the guidelines range; is that correct?

Attorney Peck, do you agree with the PSR's calculation?

MS. PECK:  Yes, Your Honor.

THE COURT:  And Attorney Sheehan?

MR. SHEEHAN:  We do, Your Honor.

THE COURT:  Then I will adopt the PSR's adoption of the guidelines as my own calculations, specifically both Count One and Count Three end up at the same place, but I'll announce both.

For Count One, the base offense level is 36 and there are no other adjustments for it, so the adjusted offense level is 36.

For kidnapping, the base offense level is 32. Two levels are added because the victim sustained serious bodily injury.  Two levels are added as well because a dangerous weapon was used, in this case in particular a baseball bat.

Then for Count Three, the adjusted offense level is also 36.  Three levels are subtracted from 36 for acceptance of responsibility resulting in a total offense level of 33.

Mr. Pena falls into Criminal History Category I with a criminal history score of zero.  Thus, the resulting guidelines ranges are as follows:  First, with respect to custody, a period of imprisonment of between 135 and 168 months; with respect to supervised release, for Count One, a period of supervised release violation of between one and three years, and for Count Three, a period of supervised release of between two and five years.  He is ineligible for probation.  The fine range is $35,000 to $250,000.  And there is a mandatory special assessment that I must impose of $100 on each count, so a total of $200.

Attorney Peck, is there any update on the status of any request for restitution by the victims?

MS. PECK:  No, Your Honor.  I think at this point they're going through our victim witness resources,

so there's been no request for restitution at this time.

THE COURT:  All right.  So, Mr. Pena, restitution is money that you would need to pay back to the victims of the crime, but it doesn't appear at this point that the victims here are claiming any request for compensation as their expenses are being covered through another means, so restitution will not be part of your sentence.

All right.  So that covers the technical matters that I had hoped to address, and I'll give the attorneys the chance now to argue for what they believe an appropriate sentence is here.  Usually I'll have defense counsel speak first, but I think it makes sense to hear the victim's statement so that defense counsel and Mr. Pena, if he wishes to speak, can address that in their comments as well.

MS. PECK:  Yes, Your Honor.  This is from one of victims in the case, I'm going to use his initials S.C.

"Your Honor, I'm writing a letter describing me and my wife's encounter with the kidnappers on August 25th, 2024, and the traumatic impact it has had in our lives.

"On the afternoon of August 25, 2024, I was driving with my wife next to me on Damia Drive, Danbury. When we were close and taking a right turn to Damia Drive,

our car was suddenly rear-ended by a Honda car.  I stopped my car and was surprised to see a white work van come next to us on the left.  I thought at that moment that it was an accident and was about to open the car door to look for and question the driver of the Honda car who had hit our car.  However, immediately I saw three to four guys rushing out of the van towards us wearing black clothes and black masks, some of them waving baseball bats at us asking us to get out of the car.  We panicked and tried to call 911 in the few seconds we had, but couldn't do so.  Fearing for our lives, we listened and stepped out of the car.  I tried my best to resist the attackers physically, but they overpowered me and pushed me into the van.  They dragged my wife by her hair and legs and pushed her into the van too.

"In the van my legs and arms were tied with duct tape, mouth and eyes were covered by duct tape.  I was feeling very suffocated.  My wife's legs and arms, too, were tied with duct tape.  My wife was finding it hard to breathe out of shock and fear.  They were about to cover my wife's mouth with tape but she requested them that she was asthmatic and wouldn't be able to breathe with the tape on.  They didn't cover her mouth with tape.

"They shouted at us a few times saying that if we didn't cooperate with them, they would kill us.  They

also screamed at me saying if I tried to look at them, they would kill me.  I then realized that we were being kidnapped and we were in a very dire situation.

"After a few minutes, the person with whom I had physical resistance started hitting me with his legs and baseball bats shouting how dare I try to resist him.  Others in the van then joined him and started stomping me and hitting me nonstop causing me excruciating pain.  My wife pleaded with them not to hit me, but they didn't listen.  I tried to protect my face and head with my left arm due to which it took a lot of the hitting.  I was dreading how long they were going to hit me, how bad my injuries were going to be, and what was to become of the two of us.

"After a few minutes, not knowing what to expect, we fortunately heard police sirens and got some hope that we might be saved.  The kidnappers panicked and the van accelerated further.  And after a few minutes, the van crashed and came to a halt.

"The van's door was opened and my tape was removed from my eyes, mouth, arms and legs by police and ambulance staff.  Tape, too, was removed from my wife's arms and legs.  We were then taken to the Danbury Hospital emergency room.

"The hospital was on lockdown for about 20

minutes to ensure there was no further threat to our lives. The lockdown made us even more scared as we thought we were safe in the hospital. The lockdown was then removed and we are then attended to by the hospital staff.

"I realized that I was badly beaten up on my face, eyes, left arm and head. One of my eyes was very swollen and couldn't be opened, and there was a lot of pain in my face and head. My wife suffered bruises on her legs. We were both in utter shock and disbelief.

"The emergency doctor and staff were also shocked and they felt sorry for us. They carried out multiple tests on me and checked the bruises on my wife. The doctor advised me not to work for a week. It took about four days for me to fully open my swollen eye. I started feeling more pain in my left arm after a day of the incident and sustained a fracture on my left arm near the elbow that took more than a month to heal. I couldn't physically attend the office for a couple of weeks. The healing of the injuries for me and my wife felt very slow and heartbreaking.

"After speaking with police and reading the news, we learned that our house had been surveyed and that the kidnappers had followed us when we left home on August 25, 2024. This revelation only intensified our

fear and trauma.  We became so afraid that we confined ourselves to the house, not stepping outside for weeks. We endured sleepless nights, constantly on edge, repeatedly checking our Ring camera to see if anyone was lurking outside threatening to harm us.  My wife became terrified of any loud noise around the house and suffered panic attacks as the incident replayed in her mind for weeks.  She lost her appetite for several weeks.  While I eventually forced myself to return to the office after a couple of weeks, my wife couldn't bring herself to leave the house for much longer.

"In the following months, driving for work and running errands had become incredibly difficult for me.  I constantly was checking my review mirror to see if anyone was following me.  If I noticed a car behind me for more than five minutes, I panicked and sometimes changed my route to see if the car was still following.

"To this day, there are times when my wife struggles to feel comfortable in public spaces, experiencing constant anxiety and paranoia, often glancing over her shoulder.  We frequently check our Ring camera to monitor who is around our home.

"The news of the kidnapping has spread throughout our community in Danbury due to media coverage, so we try to avoid going out for shopping and errands

whenever possible.  When we do have to go out, we do so at odd hours to avoid encountering anyone who might bring up the traumatic event and make us relive the nightmare. Unfortunately, this incident continues to affect both my wife and I in countless ways."

THE COURT:  Thank you, Attorney Peck.

All right.  Attorney Sheehan, I'll turn to you first for any comments you wish to make about the appropriate sentence here.

MR. SHEEHAN:  Your Honor, Mr. Pena's mother would like to briefly address the Court, Jenise.  And I would ask her --

THE COURT:  Sure.

MR. SHEEHAN:  -- to come forward.

THE COURT:  Ma'am, you can come to this lectern in the middle.  And if you could please spell your first and last names for us.

MS. BORRERO:  Good evening, Your Honor.  Jenise, J-E-N-I-S-E.  Borrero, B-O-R-R-E-R-O.

THE COURT:  Thank you.  Please go ahead.

MS. BORRERO:  Your Honor, first I want to apologize for the actions of my son.

I would like for you to have mercy in this sentencing today.  I understand this situation is serious, very serious.

We didn't raise Anthony like that.  Anthony's always been a good kid, never been into problems in middle school, never been into problems in high school.  Always worked double shifts to support his daughter.  And his daughter really needs him in her life.  And I would just like for you to have mercy on him today.  I'm sorry.

THE COURT:  That's all right.  Thank you.

MS. BORRERO:  That's all, Your Honor.  Thank you.

MR. SHEEHAN:  Your Honor, I did also previously mention that his stepfather is here as well as his brother, younger brother Jonathan, and his sister Janelle.

Well, I've been a lawyer for a long time.  And this case is extremely, extremely troubling.  I think if we go back to figure out what happened here, it struck me that it kind of almost started like a Hollywood script.  We had *Ocean's Eleven*, that film comes to my mind.  There was a rich guy who was loaded with cryptocurrency.  There were three young guys: a person by the name of Serrano, age 21; a person by the name of Lam, age 20; and a person that we know as V.C. who was the son of the victims in here, I think he was about 20, he might have been a little bit younger.  They cooked up a plan to steal the rich guy's money and they succeeded.  And it appears they went wild spending on cars, on Penthouses, private jets,

cryptocurrency, you can't trace it.  What could go wrong here?

Then a plan originated, well, to rob the robbers.  You have that case in front of you, Your Honor, Mr. Schwab.  Mr. Serrano and Lam, they have their case pending in the district court, in federal district court in the District of Columbia.  It appears that Mr. Schwab figured out, well, that's where the money went.  So he organized a scheme.  He knows a fellow by the name of Rey, he knows a fellow by the name of Anthony Borrero, Mr. Pena's cousin.  And he says to Mr. Borrero, let's recruit a crew.  That's where Anthony comes into the picture.  And that's where the picture that was, you know, sort of rob the robbers, *Ocean's Eleven* kind of.  I don't know if *Ocean's Eleven* would be considered a comedy or whatever, but this comedy turns extraordinarily dark. It's not a comedy at all.  Because the plan is grab the kid's parent and we'll get a ransom.  And Anthony, much to his shame, participates in that darkness.

First it kind of seems a little bit like a game. Fly up to New York, somebody gets you the tickets, spend the evening in New York, and then you're off to this swanky Airbnb in Danbury that somebody had arranged.  But it's not a game at all because there's baseball bats involved and duct tape and ropes.  We're going to do

something that's really awful.  We're going to survey this family and we're going to grab the parents.  We're going to tape and bind her.  We're going to hit the father when he resists.  We're going to put them in this van.  And then fortunately because it's in the middle of the daytime, 5:00 or 5:30 in the summer in Danbury, people see what's going on.  Fortunately.  And the police arrive.  And they take off.  And fortunately there's an accident, the car stops, and then they run into the woods.  That's what Anthony participated in.  He pled guilty to that offense, as you know.

He's been in jail since his arrest which was back on August 25.  He's been in state custody because there's parallel cases going, although the state case is going to be dismissed once Anthony gets sentenced on the federal case, but he's been in jail for over nine months.

Now, a question I think we have to face in this sentencing is there was a -- I think the only word that comes to my mind is horrible crime committed.  And then on the other side is Anthony.

Is Anthony all darkness?  I think the answer to that is no.  He's a father.  He's a son.  He's a brother. He's a grandson.  He's only 23 at the time of the offense. He dropped out of school to take care of his family.  He has a history of working.  He's not the jet set that was

Mr. Serrano, Mr. Lam, V.C., James Schwab.  He was not driving around in a limo or -- you know, I think there's actually three Lamborghinis that were involved in this whole thing, not with Anthony but back when it was a comedy, as we can say.  Not a comedy.

Anthony, what caused him to go so fast and so far astray?  He has strengths.  His family supports him.  His family is appalled by his conduct.  But they haven't thrown him out.  They might have been tempted to, I don't know.  When your child does something so fundamentally wrong, what do you do?  I hope they can find it in your hearts to look on their good side without excusing their bad side, the bad thing that they did.  And that's what Anthony has been blessed to have a family which includes his aunts and uncles in Miami, a family to kind of support him.  Not to say Anthony, that was -- you shouldn't have done that; but to say Anthony, you're going to have to pay for this.  You're going to have to prove yourself to us, and we will support you.  And Anthony is fortunate that way.  Not everybody's that fortunate.

What was Anthony's weakness?  Well, it was a lot of money.  Greed is the word that comes to mind.  It was going to be easy.  Well, it didn't turn out to be easy, but it seemed like it.  He was living in a fantasy world that was fueled by his own, hidden from other people, but

his own addiction to drugs and gambling, his own youthful sense that, you know, I don't think through all these things, I don't foresee the harm that I'm going to do.

He's had more than eight months to reflect on his future.  He knows that he brought shame and disappointment to his family.  We've talked about if it was his mother and his father in the van, how would he feel?  And all I get is shame, disappointment, and sorrow.

He knows that he's going to be separated from his child for a chunk of time, a good chunk of time.  And he knows that he's unable to actively participate in her upbringing except by phone or by visits if that can be arranged.  He knows he hurt those people.  What their son did, they didn't deserve that.  Nobody deserves that kind of treatment.

How does he make up for all those harms?  He's asked himself that question.  Well, the plea of guilty I think was a good start, an initiator.  Except for a mess-up in prison once in December, he's done well in prison.  He's on his way to getting his GED.  That takes a while to get into the classroom there, because you're in the local county jail.  He's also achieved a way of looking at his life that he knows that his path has to be one of sobriety and not gambling and not drugs.

He's grateful for his family support.  He's

not -- his family is not excusing him for what they know will be a long road ahead for him and also, to his shame, his brother Michael is also before Your Honor having pled guilty in this case. But he's lucky, as I said. This family, a mother, brother, sister, grandparents, neighbors, they don't condone, but they'll support him. Anthony doesn't take this for granted. They could have turned their back on him, but he's committed to doing all that he can to re-earn their trust. That's why I am asking Your Honor to impose a sentence that is below the guidelines in this case but still very substantial. And I am asking, with Anthony's permission, that the Court impose a sentence of no greater than nine years, which is a moderate deviation from the guidelines, to reflect his age, in part, to reflect his conduct. And I would suggest to the Court that that would be a sentence no greater than necessary under all of the circumstances of this case to be an appropriate sentence here.

THE COURT: Sure.

THE DEFENDANT: Thank you, Your Honor.

I would first of all like to apologize to the Court. I wish the victims were here so I could apologize

to their face and let them know that I'm sorry for the harm that I've caused, not just the physical harm but the mental harm of being traumatized.

Having been incarcerated for about nine months, I have been reflecting, reading the Bible and acknowledging no one has put me here but myself through my terrible actions.  I was so blinded for the money while high I didn't see how I was harming and probably traumatizing them for life.  Reflecting day by day after each phone call with my daughter and my mother I've acknowledged through my actions I failed at being a father by not being able to be there in my daughter's life and failed at being a son by not showing my mother better.

Nine months in, I have been detoxed for nine months already with no drugs in my system.  I went in the world thinking I needed to be high every day to now nine months, it was just all in my head.  I have gone this far and I want to continue.  I want, also need programs for drugs and alcohol just so I can stay on this course because I really do feel like the whole time I've just been -- I've been chasing a high.  It took me forever to admit to myself that I was an addict.  It took me being sober for this long to see that I don't need that in my life anymore.  Being sober and reflecting, I've realized I used plenty of excuses for my actions.  My naive self

thought with my security license I was set, not needing an education.  But through this opportunity I crave for an education now not only for a well-paying career to support my daughter, but to prove to you that you can come in the system and come out better and stronger.  I understand nine months is nothing compared to my guidelines and I'm not begging or crying, because I deserve this.  I only ask for you to be fair so I can come out to still be with my daughter in my daughter's life before she becomes old and feels me not being in her life, she will no longer love or need me like I felt with my biological father for not being in my life.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Pena.

Attorney Peck.

MS. PECK:  Thank you, Your Honor.

I just want to start by saying that the victims had me read the statement because they don't feel safe and they did not want to relive this by facing somebody who had caused them so much pain.

I know the Court had asked some questions about the situation with the male victim's work situation and visa.  I do have a bit of an update on that, so I wanted to put that before the Court as well.

So, as I mentioned through the probation officer, he did lose his job.  They saw him as a liability

because of the publicity.  He had a work visa and he had been here for I want to say two decades or more working. And his family was here on his work visa.  At this point through our office he is applying for, with our help, a U visa, but as this Court probably recalls, that process is very lengthy.  There's no certainty that he'll get it. And there's no certainty about when he would get it if he does.  So he cannot work with no visa.  And so right now he and his wife are spending their savings and trying to hold out until hopefully a visa comes their way.  But if it doesn't, they obviously won't be able to remain in this country anymore.

So there's been a very significant change in their life beyond the physical and emotional trauma.  And I can tell the Court from my meetings with them that it is very much present for them, this experience and the trauma.  It's interesting, the male victim is very stoic. And so listening to his letter was interesting because he puts on a very brave front.  His wife is having a lot more trouble with that, and I don't know that she will ever fully recover from what's happened.

My colleague, Mr. Sheehan, mentioned darkness. And I do want to dwell on that for just a moment.

THE COURT:  Sorry.  Just before we leave the topic of the effect on the victims' lives, I'd like to

understand a little bit more, to the extent you know, the reasons for his employer letting him go and whether they were related to the allegations of his son's activity, because it would be unusual if someone were simply the victim of a crime for the publicity of that to be enough for an employer to say you're no longer welcome here.

MS. PECK:  It's my understanding, Your Honor, that it was the nature of the allegations against their son and their being victimized in relation to that that led his employer to release him from employment because there has been a lot of publicity, even in the early days there was.  It continues, which is something I want to touch on in a few minutes.  So it's my understanding that it was the specific nature of the allegations against his son.  He was -- the father was in the IT department at his employer.  I don't know whether there was some concern in that regard.  That's my -- a little bit of my speculation.

THE COURT:  And it's a financial services company?

MS. PECK:  Yes, Your Honor.  I think, and I'm checking with the agent to make sure I'm not speaking out of school, but I think that's what was going on, not just the fact that he was a victim of violence.

THE COURT:  Thank you.

MS. PECK:  But the violence, that period of time

on August 25, 2024, for these victims was very, very dark. And this defendant, in particular, was very, very violent.

THE COURT:  So that is a question that I have for you.  To the extent you know of the different roles of the six people, I would be interested in knowing where Mr. Pena falls in any hierarchy.

MS. PECK:  Okay.  I'm happy to go through that with Your Honor.

Obviously we have a case that's pending before Your Honor against James Schwab.  Mr. Schwab is somebody who is in the world of -- a world I didn't really know about until this case, this world of discord and telegram and cryptocurrency and games like Minecraft leading to people connecting over the internet in a way that leads to things like these social engineering schemes where they pose as, you know, human resources or customer service and various other ways that they convince people to give access to personal information that allows people access to accounts and that kind of thing, which is how the victim of the large cryptocurrency case was victimized. But Mr. Schwab and others like him are in that world and they are very involved in computer hacking, they're very involved in what's called SIM swapping which is getting another person's phone for their use through the SIM card online digitally, also very involved in identity theft and

those kinds of things.

So he and associates of his became aware before the public at large would have become aware of this large cryptocurrency theft.  And this is not the first.  It may be a very large one and one that's generated a lot of publicity, but this kind of thing happens I think with some regularity in this world where cryptocurrency because of its nature being untraceable is something that is frequently stolen and then sort of laundered in various ways, through various shady websites and through people who are willing to launder that currency and make it into money that you can spend on things like Lamborghinis and nights out at nightclubs and such.

So Mr. Schwab and his associates, and that is a case that's still under investigation, but they became aware of this and began soliciting sort of the hands-on people to be on the ground to help them get this from, extort this from the victims' son.  So you have Mr. Schwab.  You also have some of his other associates.

There was an original solicitation of people in St. Louis, they were paid for by Mr. Schwab and a fraudulent credit card to come and surveil.  And I think the hope was that they would be able to force their way in when the son was home and force him to provide the information that Mr. Schwab and his associates would need

to get the cryptocurrency in their accounts.  And then I think when it turned to a kidnapping, the St. Louis crew was not willing to go that far.  They were not willing to do what ultimately Mr. Pena and his crew did do.

But the first persons that were contacted by Mr. Schwab would have been Mr. Borrero and then ultimately Mr. Diaz.  They were the ones that were -- and Mr. Borrero, in particular, was one that was here before the others.  And he was the one that, when pressed by Mr. Schwab and the others when the St. Louis people suggested they were getting on a plane and leaving, to bring others into the mix.  And Mr. Borrero said he had people.  He called them his dogs that he could bring up and that they would be all over this, essentially.  This would be something right in their line of work.  So Mr. Diaz and then Mr. Pena, Mr. Romero and then Mr. Rivas came up.

Now, once they got here, this was not an impulse situation.  I mean, they were here for a period of days. They were getting supplies.  They were keeping the victims under surveillance for hours and days.  They were watching them at their home.  They were following them when they would drive.  They were trying to determine when the victims' son would come out because I think there was still some hope they could force him.  But I will say,

unlike the St. Louis crew, the Miami crew did not have a problem involving the parents and taking action against the parents.

Mr. Pena was one of the ones in the van.  He was one of the ones who was literally dragging the victims out of the car that they were in, beating the man in particular both with fists and kicking but also with baseball bats.  And there were four baseball bats that were purchased and were found at the scene between the various vehicles, two of them being in the van itself.

So it's the understanding of the agents, based on their interviews, that Mr. Pena was one of the most violent of the crew, to be honest, and that he was angry I think in part because the father resisted.  And so it was a very, very dark situation for the victims.

I would note that the father, having his complete face duct-taped would be -- for me that would be beyond horrible.  I know that one of the defendants, not Mr. Pena, prevailed upon the others to not do that to the mother because she was asthmatic and they thought she might just die at that point.  Once in the van the beatings continued and the threats of death continued and saying things like your son is responsible for this, and all of that.

I would note that in the pictures that we

provided Your Honor there was plastic sheeting that was put up which I thought was sort of chilling and a little bit telling about what they expected would happen in that van.  And they were headed to the Airbnb, so they intended to keep these people for as long as it took.  And I think there was a very real fear on the part of the victims that was well-founded that they would die, that these people were so violent with them and they were so intent on hurting them that they were going to die.

THE COURT:  How long had the Airbnb been rented for?

MS. PECK:  I believe it was rented on the 21st of August and this happened on the 25th.  So Mr. Schwab --

THE COURT:  And beyond that, had it been rented for days afterwards to support the theory that they were going to bring them back?

MS. PECK:  Let me just check with the agent on that one.

(Pause.)

MS. PECK:  So as I understand it, they were doing a lot of last-minute extensions.  Initially it was going to be the 22nd through the 26th.  Then it was moved up to the 21st to the 26th.  But I think there was an understanding that they could extend it.  And the van, for example, was one that they -- they were extending rentals

as they went.  So I think it was a fluid situation.  And I think they thought they were going to perhaps be able to convince the son relatively quickly, but we didn't get to that point.  But they had a plan that could be extended for a period of days is our understanding from the Airbnb and the van rental and the other cars.

THE COURT:  Thank you.

MS. PECK:  I also think this is a situation where, I agree with Attorney Sheehan, greed is a big motivator here.  And there's a lot of money at issue in these situations.  It's an astounding amount of money and very young people with access to an astounding amount of money.  And I think if you are somebody like Mr. Pena and you have people that have access to the information and a willingness to give you a piece, it's a very alluring thing.

But I would note, Your Honor, that this is not an impulse crime.  You know, I think about an impulse crime, some of the gang cases that we've had where you have somebody shoots at then, they get in a car and they run off and shoot right back, you know, arguably you can say that's on impulse.  This is a situation where you have travel from over a thousand miles to come up here to a place -- they'd never been to Connecticut.  They are there for a period of time.  They are surveilling.  It's a lot

of time sitting in a car, watching.  It's tedious.  You have to be motivated if you're going to do that.  It's not the kind of thing that you just, you know, oh, on a whim we're going to do this.  They had to be involved in planning, supplying.  We have pictures of this defendant and the others at Walmart, at the mall.  It's not a -- it's not the kind of impulse crime that I think the Court may see in other situations.

And I do think, if you look at this defendant's life, there's a lot of ways in which he has been a responsible adult.  You don't decide that you're going to work full-time more than one job to pay for a daughter and be an immature person who can't use judgment.  The fact is he used judgment here and the judgment was that there was a lot of money here.  And he could use his abilities, he can be the guy that can forcibly grab somebody, beat them and put them in a van even if he can't be the guy that's going to hack into a computer account and siphon off millions in cryptocurrency.

The other thing I want to address, Your Honor, is on deterrence here.  This case has garnered a lot of media publicity.  It's continuing to garner that kind of publicity.  And not just in the public realm, but it's also something that's being monitored very closely by people in this world of cryptotrading and social

engineering and the world that James Schwab and people associated with him inhabit.  And they are looking at the docket.  They are putting things up on the internet from court papers in this case and related cases around the country.  So I do think that deterrence is particularly important in this case.

This situation, unfortunately, is not unique. There are others where similar things have been tried, kidnapping, assaults, abductions with the motivation to extort gains like what happened here.  And in part, these victims were particularly vulnerable because, as Mr. Sheehan said, their son is not going to be able to call the police and explain how he's the victim of this because he has stolen $243 million in cryptocurrency.  So they were targeted because no one believed they could do anything about it except pay and keep their mouth shut. So I think it's important that the word go out that this kind of thing is not going to be tolerated, that there are very, very serious consequences.

I sometimes get the sense in looking at this that it's almost like a video game come to life.  They feel like, you know, okay, we can vanquish this victim and that will be par for the course.  So I do feel like in this world there needs to be deterrence.  Obviously there needs to be deterrence for this defendant but there needs

to be more general deterrence as well because the money out there is such that there's a very high motivation to do this kind of thing.  And for people who haven't had any contact with the criminal justice system, they need to see that this is the kind of thing that must be taken seriously because of the effects that it has on the victims which are obviously substantial.

Unless the Court has any questions for me --

THE COURT:  No, I think you've answered my questions.  Well, let me ask you one.

On specific deterrence related to Mr. Pena specifically, given that he had no prior criminal history before this offense that's countable at least under the guidelines and had a history of working, how should I be weighing the specific deterrence requirement?

MS. PECK:  Well, I know that the Court is not bound by the guidelines, but I would note that the guidelines are taking into account that these are people that have had little to no contact with the criminal justice system, someone in Criminal History Category I.  I know that the JSIN information is not binding but it is put in the PSR I think in part for a reason, to get a sense.  And those in Criminal History Category I, the median sentence is within that range; in fact, in the middle of that range.  So I think that the notion of this

being the kind of crime that it is, being very, very serious, I do think that the guidelines do give the Court a pretty good sense of what we do with someone in Mr. Pena's situation, somebody who committed a very, very serious violent crime and not been in the criminal justice system at all or in a meaningful way.

THE COURT:  Thank you, Attorney Peck.

Attorney Sheehan, do you wish to reply?

MR. SHEEHAN:  Just briefly, Your Honor.

I wouldn't presume to know what's going on in your head, but I think that a sentence of nine years when nobody has ever been to jail is a very long sentence.  I think that there is a dizzying effect, sort of cryptoworld maybe buys you a ticket to the White House.  Yes, it does. It's an odd world.  I don't think -- I think Your Honor's sentence should be appropriate to deter other people from committing this kind of crime.  I don't think Your Honor's sentence should be extra long in order to impact on the cryptocurrency world which is, at least from my perspective, is beyond impact.  It seems like people buy nothing, get money, and then I don't know.  Anyhow, that's just my own rant on that.  But I do submit that the sentence we're asking for in that range is a very substantial sentence.  Thank you.

THE COURT:  Do you have any response to the

government's contention that Mr. Pena was one of the more violent members of this crime?

MR. SHEEHAN:  It's not in the PSR, Your Honor. It's not -- I think there was a degree of violence from all of them that I have seen in the discovery that was provided.  Mr. Pena is not backing away that he was among them, engaged in that conduct, but I don't think he should be treated as the ringleader.  He certainly didn't set up this operation.  And to the extent that it's not in the PSR, I don't think it should be a grounds for the Court giving an extra boost to Mr. Pena.

THE COURT:  And what is your response to the government's argument that this is not a crime of impulse such that someone in their early 20s should be afforded some leniency because of the premeditation, the number of steps that were required for this to be executed, and Mr. Pena's own history of employment as a person who functioned as an adult in the real world and comes to it sort of, in the government's view, fully understanding the decisions he's making?

MR. SHEEHAN:  I think, Your Honor, certainly it wasn't a crime of impulse in the sense that when this all started, which actually, from my take on the discovery, seems to have started with them coming up from Miami which I believe was on the 23rd, it could have been the 24th of

August they came up.  But I do think that impulse -- I do think that the fact of his youth is something that the Court can take into account.  He should not be penalized for going to work and trying to support his family.  What he should be penalized for is making this decision to embark on this awful crime that he did and that he's come before Your Honor and pled guilty to.

THE COURT:  All right.  Thank you.

Mr. Pena, in sentencing you, I'm required to consider a number of factors under the law.  They include the nature and circumstances of your offense and your history and characteristics; the need for the sentence imposed to reflect the seriousness of the offense; to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from future crimes you might commit; to provide you with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.  And I must also consider the kinds of sentences available, the Sentencing Guidelines, and the need to avoid unwarranted sentencing disparities, meaning differences between the sentence in your case and the sentence in cases involving defendants with similar records who have been found guilty of similar conduct.

So, in short, I have to consider everything that I have learned about you through this process, the good and the not so good, and weigh all of that information to come up with a sentence that is fair, just and reasonable in your particular case and that is sufficient but not greater than necessary to serve these purposes of sentencing.  Let me explain how I'm thinking through these various factors here.

First, on the issue of seriousness of the offense and just punishment, there is no question in anyone's mind in this courtroom, I think, that this is an incredibly serious and violent offense.  It involved a well-planned, premeditated act of violence against two innocent people motivated by greed that required traveling here from out of state, renting a home and vehicles for the duration of the plan, surveillance of these two innocent victims, purchasing of supplies in order to carry out the scheme, brutally assaulting and kidnapping these two people, and then fleeing from police.  And it's clear from the statement of the victim that we heard today that in addition to the physical wounds and scars which will heal, these two people are going to be living with this nightmare for the rest of their lives.  This will be a day they never forget.  So your behavior has very serious, lasting consequences on these people who were doing

nothing more than going about their days. So the seriousness of the offense alone would justify a very lengthy sentence.

I'm also thinking about deterrence and protection of the public. The sentence needs to be lengthy in order to incapacitate you from committing a violent crime in the future. Although I recognize that you have no criminal history before this, you found yourself involved in an incredibly violent act, and the fact that even having had regular employment and a supportive family, you decided to get engaged in this signals to me that you are a dangerous person and the public needs to be protected from you, so you need to be incapacitated for a lengthy period of time.

It's all the more the reason that the public needs to be protected because this crime was motivated by greed. So the next time a quick money opportunity might come up, I have little confidence that you would make a different decision, especially given that, again, you were working and you had a supportive family and you had a child. You made the decision to do this despite those things. And to me, that demonstrates that the greed was more important to you than your family or than the working jobs that you had held and being a productive law-abiding member of society.

When I think about deterrence, the sentence has to deter you. Now, you don't come to the Court with a lengthy criminal history like some people that I see. But the fact, again, that you were willing to engage in this group violent criminal activity suggests to me that the sentence has to be long enough to send a message to you that you can never do this again.

And the point the government makes about general deterrence, too, here I think is an important one. The crime that you committed is obviously part and parcel of a larger scheme and group of events as we heard from the government today. And I acknowledge it didn't start with you. You were not the brain child of this scheme. But it is a scheme that, from the government's representations, is one that is garnering a significant amount of attention among people who may be interested in carrying out a similar type of scheme in the future. And so while general deterrence in some cases I think is a less important sentencing factor because people may not change their behavior as a result of a sentence that someone receives, in this particular case I think there's reason to believe that that may actually happen, that people may be paying attention to the sentence that you and your codefendants receive in this case because cryptocurrency scams are becoming more prevalent and because there's so

much money at stake.  So a sentence that is lengthy and that would deter people from taking the risks is important in my mind.

I'm also considering your history and characteristics, and I've learned a bit about you through the PSR process and the advocacy of your counsel.  Your circumstances are somewhat mitigating.  I know that you were raised in somewhat difficult circumstances although it appears that your mother and your stepfather took care of your basic needs even though you didn't have a continuous relationship with your biological father.  With respect to your education, although you do not have a GED, I acknowledge that you're taking steps towards earning one, which is a positive step forward.  And I also acknowledge, as I've said, that you were employed in various jobs and did not have any countable arrests before you got involved in this criminal enterprise.  But again, it sounds like the promised large payout of this scheme appeared to somehow draw you away from your otherwise law-abiding lifestyle.

I appreciate that you apologized to the victims. I think that is a genuine apology.

And I've learned a little bit about your substance abuse history.  It doesn't appear from the PSR to be particularly severe.  And while it's possible you

were under the influence of some substances when the kidnapping and the beating occurred, there was -- you had the choice at many different points in this scheme to do the right thing. You could have decided not to come up to Connecticut from Florida. You could have decided not to participate in the group enterprise of renting the vehicles, renting the home. You certainly could have decided not to have beaten up innocent people, cause them bruises and psychological injuries that will last their entire lives. So while on the one hand you have some mitigating circumstances, I also find that you were capable of making the right decision and that this was not a crime of impulse.

You are on the younger end of the spectrum for people involved in the federal criminal justice system, but you're not the youngest. In fact, you got your younger brother involved at age 18 in this scheme as well. You knew better, as evidenced by the fact that you were a law-abiding, working adult for years before you got involved in this scheme. So I don't think a significant departure from the guidelines on the basis of age is appropriate. A small departure is, but not a large one on account of the violence and the premeditated nature of this crime as well as the other reasons I've described.

So for these reasons, I am going to sentence you

as follows:

On Count One, a term of imprisonment of 60 months, or five years.

On Count Three, a term of imprisonment of 132 months, which is 11 years, to be served concurrently with the sentence imposed on Count One.

I will also sentence you to a term of supervised release which is supervision by the U.S. Probation Office following your term of imprisonment for two years to be served concurrently as to both counts, and I'll announce the conditions of your supervised release in a moment.

You will be subject to a special assessment of a total of $200, $100 on each count.

I will not impose a fine as I find you have no ability to pay one given that you are represented by appointed counsel.

So then turning to the conditions of supervised release, you're going to be supervised by the U.S. Probation Office for a period of two years after you're released from custody.  There are three types of conditions that will govern your supervised release period: standard conditions, mandatory conditions, and what we call special conditions.

Does the government wish for me to read all of the standard conditions into the record?

MS. PECK:  I think so, Your Honor, in an abundance of caution.

THE COURT:  All right.  These are what we call the standard conditions, Mr. Pena.

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the Court about, and bring about improvements in your conduct and condition.

First, you shall report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment unless the probation officer instructs you to report to a different probation office or within a different reporting time frame.

Second, after initially reporting to the probation office, you will receive instructions from the Court or the probation officer about how and when you are to report to the probation officer, and you shall report to the probation officer as instructed.

Third, you shall not knowingly leave the federal judicial district where you are authorized to reside

without first getting permission from the Court or the probation officer.

Fourth, you shall answer truthfully the questions asked by your probation officer.

Fifth, you shall live at a place approved by the probation officer.  If you plan to change where you live or anything about your living arrangements such as the people you live with, you shall notify the probation officer at least ten days before the change.  If notifying the probation officer in advance is not possible due to unanticipated circumstances, you shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

Sixth, you shall allow the probation officer to visit you at any time at your home or elsewhere.  And you shall permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

Seventh, you shall work full-time, at least 30 hours per week, at a lawful type of employment unless the probation officer excuses you from doing so.  If you do not have full-time employment, you shall try to find full-time employment unless the probation officer excuses you from doing so.  If you plan to change where you work or anything about your work such as your position or your

job responsibilities, you shall notify the probation officer at least ten days before the change.  If notifying the probation officer at least ten days in advance is not possible due to unanticipated circumstances, you shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

Eighth, you shall not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you shall not knowingly communicate or interact with that person without first getting the permission of the probation officer.

I have a question for the government on that and for defense counsel on that particular condition.  Given that one of Mr. Pena's family members is a codefendant in this case and has been convicted of a felony in the sense that that person has pleaded guilty, is the government requesting that this condition apply to Mr. Pena's brother, Michael Rivas I think is his name, and if so, are there particular factual findings the government believes I should make on the record in order to justify that the communication condition be applied to his brother?

MS. PECK:  Your Honor, while we do know that this defendant was integral in getting his brother involved, I don't think we're pushing for the condition to

apply to Mr. Rivas.

THE COURT:  Attorney Sheehan?

MR. SHEEHAN:  Thank you, Your Honor.  I'd also ask, I know Mr. Pena's stepfather has a prior conviction. I'd ask that he be excluded as well.

THE COURT:  Government's position?

MS. PECK:  No objection.

THE COURT:  All right.  So I'll read that condition again and I'm going to exclude two specific people from it.

First, the first sentence will stay the same, you shall not communicate or interact with someone you know is engaged in criminal activity.  The second sentence will be modified.  If you know someone has been convicted of a felony, you shall not knowingly communicate or interact with that person without first getting the permission of the probation officer, but the second sentence does not apply to either your stepfather whose name is --

MR. SHEEHAN:  Michael Borrero -- I'm sorry, Michael Rivas.

THE COURT:  So the second sentence does not apply to Michael Rivas Sr. or Michael Rivas Jr.  So you're allowed to communicate or interact with your stepfather and brother without needing permission, advance permission

from the probation officer.

Number nine, if you are arrested or questioned by a law enforcement officer, you shall notify the probation officer within 72 hours.

Number ten, you shall not own, possess or have access to a firearm, ammunition, destructive device or dangerous weapon; that is, anything that was designed or was modified for the specific purpose of causing bodily injury or death to another person.  Apparently the standard condition also says such as nunchucks or tasers, so I'll read that into the record.  Those are apparently devices that would count.

Standard condition number 11, you shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the Court.

Standard condition number 12, finally, you shall follow the instructions of the probation officer related to the conditions of supervision.  Upon a finding of a violation of supervised release, you understand that the Court may (1) revoke supervision and impose a term of imprisonment, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

So those are the standard conditions.

Then we have a set of what we call the mandatory

conditions.  Those are as follows -- although let me first ask the parties if the parties have any objection to the proposed mandatory or special conditions set forth in the PSR.

MS. PECK:  The government does not, Your Honor.

MR. SHEEHAN:  No, Your Honor.

THE COURT:  Okay.  So the mandatory conditions are as follows:

First, you shall not commit another federal, state or local offense.

Second, you shall not unlawfully possess a controlled substance.

Third, you shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter for use of a controlled substance.

Fourth, you shall pay the assessment of $200 that has been imposed in accordance with 18 U.S.C. Section 3013.

And finally, you shall cooperate in the collection of a DNA sample.

And then there are two special conditions.

First, you must participate in a program recommended by the Probation Office and approved by the

Court for inpatient or outpatient substance abuse treatment and testing. You must follow the rules and regulations of that program. The probation officer will supervise your participation in the program. You must pay all or a portion of the cost associated with treatment based on your ability to pay as recommended by the probation officer and approved by the Court.

Second, you must participate in an educational and/or vocational services program and follow the rules and regulations of that program. Such programs may include but are not limited to high school equivalency preparation, job readiness training, and skills development.

The reasons for these special conditions are, for the substance abuse treatment condition and testing condition, that you have expressed a history of substance use including in your comments today. And the condition relating to an educational or work program is recommended based on your lack of a high school education and need for job readiness training.

Officer Leone, have I overlooked anything or do you have any further comments?

THE PROBATION OFFICER: The only thing I would mention, Your Honor, is a request to have supervision, not necessarily jurisdiction but supervision transferred to

the Southern District of Florida, assuming that Mr. Pena returns to the Southern District of Florida upon release.

THE COURT: Attorney Sheehan, do you know if it is Mr. Pena's intention to return to the Southern District of Florida upon release?

MR. SHEEHAN: Yes, Your Honor.

THE COURT: So then I will order that supervision be transferred to the Southern District of Florida or to any other district where Mr. Pena may choose to reside following his term of imprisonment.

MR. SHEEHAN: Thank you, Your Honor.

THE COURT: Does either counsel know of any reason that the sentence I have described cannot legally be imposed as the sentence of the Court? Attorney Peck?

MS. PECK: No, Your Honor.

THE COURT: Attorney Sheehan?

MR. ALEXANDER: No, Your Honor.

THE COURT: Okay. So what happens next, Mr. Pena, is that the judgment of the Court will be prepared for my signature and then will be posted to the docket in this case.

Now, if you wish to appeal, you must file a written notice of appeal within 14 days of the entry of judgment. I'm not sure if we'll get the judgment on the docket today, but just to be safe you should consider your

deadline for filing a notice of appeal as 14 days from today.  Do you understand that time limit?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You can file a notice of appeal yourself or you can ask Attorney Sheehan to do so on your behalf.  If you wish to appeal but you cannot afford to do so, you can apply for leave to appeal in forma pauperis. If that motion is granted, the Court would waive the filing fee for your appeal.

Now, in your plea agreement you had agreed with the government not to appeal the sentence imposed by the Court if that sentence did not exceed, meaning was higher than, the following parameters:  135 months of imprisonment, three years of supervised release, and a $200 special assessment.  I believe that the sentence that I have imposed falls below each of those thresholds.  But again, if you nevertheless wish to appeal, please make note of the date to do so, which is within 14 days of the entry of judgment.

Attorney Peck, are there any open counts to dismiss against Mr. Pena?

MS. PECK:  Yes, Your Honor.  Count Two, the carjacking count, we would move to dismiss that.

THE COURT:  That motion is granted and Count Two is dismissed.

Attorney Sheehan, is there a request for designation?

MR. SHEEHAN:  There is, Your Honor.  I think the closest facilities that would be within his likely security rating would be at Coleman FCI low or medium or, alternatively, I believe Miami is a low.  Both of those facilities I ask that Your Honor recommend.

THE COURT:  Okay.  So I'll include requests that you be able to serve your sentence at one of those two facilities, Mr. Pena, but the BOP does not always honor the request that a judge makes, so they will determine where you will be serving your sentence.  You'll hear from the BOP about where it is you're headed once they designate you to a particular place.

All right.  Is there anything further I should take up from Probation's perspective?

THE PROBATION OFFICER:  Nothing further from Probation, Your Honor.

THE COURT:  From the government's perspective?

MS. PECK:  No, Your Honor.  Thank you.

THE COURT:  Finally, from Mr. Pena's perspective?

MR. SHEEHAN:  We're all set, thank you.

THE COURT:  Mr. Pena, I understand this is a long sentence.  I do think it is justified for the reasons

I explained.  That said, I hope that you continue what you said in your remarks about wanting to better yourself during your term of imprisonment so that you can come out on the other end and be a productive member of society.  I wish you good luck.  Thank you.

The Court will stand in recess.

(Proceedings adjourned at 3:30 p.m.)

C E R T I F I C A T E


RE: UNITED STATES OF AMERICA v. ANTHONY PENA

No. 3:24CR186(SVN)


I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages 1 through 56 are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


                              /s/

                    DIANA HUNTINGTON, RDR, CRR
                      Official Court Reporter
                    United States District Court
                    141 Church Street, Room 147
                    New Haven, Connecticut 06510
                        (860) 463-3180