UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

_____

United States of America,

               Plaintiff(s),   NO. 3:24-CR-186-SVN-6

v.                         SENTENCING HEARING

Ricardo Estrada,          HARTFORD, CONNECTICUT

               Defendant(s).  November 3, 2025

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE SARALA NAGALA
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the Plaintiff(s):  Karen L. Peck
                     US Attorney's Office - CT
                     1000 Lafayette Blvd., 10th Floor
                     Bridgeport, CT 06640

For the Defendant(s):  David J. Wenc
                     Wenc Law Firm, LLC
                     184 Dusky Lane
                     Suffield, CT 06078

Reported by:        Denae Hovland, RPR, RMR, CRR
                     Federal Court Reporter
                     701.840.9786
                     denae_hovland@ctd.uscourts.gov

THE COURT:  Good afternoon.  We're here in Case No. 24-CR-186, United States of America vs. Ricardo Estrada.  Let's begin with appearances of counsel, please.

MS. PECK:  Good afternoon.  Here for the government is Assistant U.S. Attorney Karen Peck.

THE COURT:  Good afternoon.

MR. WENC:  Good afternoon, Your Honor.  I'm Attorney David Wenc.  I represent Mr. Estrada.  In the back of me are his parents, as well as his girlfriend, and Virginia Kulig, the Spanish interpreter.

THE COURT:  All right.  Good afternoon, Attorney Wenc.  Good afternoon to you, Mr. Estrada.

THE DEFENDANT:  Good afternoon.

THE COURT:  And, yes, we do have Ms. Kulig, a Spanish interpreter present.  My understanding is that she is present so that Mr. Estrada's parents can understand the proceeding.  Is that correct?

MR. WENC:  Yes, that's correct, Your Honor.

THE COURT:  All right.  I suppose there is no harm in swearing in Ms. Kulig for that purpose.  So, Ms. Kulig, you are a certified Spanish interpreter; correct?

THE INTERPRETER:  Yes, Your Honor.

THE COURT:  And could I have the clerk of court swear you in to properly interpret the proceedings for

Mr. Estrada's parents.

(The interpreter is sworn.)

THE COURT:  And, Mr. Estrada, just to make sure the record is clear on this, you are able to understand this proceeding in English; correct?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.

THE INTERPRETER:  Your Honor, may the interpreter move up?  I'm not hearing very well back here.

THE COURT:  I'm sorry.  I can't hear you.

THE INTERPRETER:  May the interpreter move up? She has provided headsets to the parents, but is not hearing very well back there.

THE COURT:  Sure, absolutely, no problem.

THE INTERPRETER:  Thank you very much.  I'll sit on the bench.

THE COURT:  All right.  I'll also note for the record that Officer Leone of the U.S. Probation Office who authored the presentence report is present in court as well.

Attorney Peck, there are persons who have rights in regard to this proceeding under the Crime Victims' Rights Act.  Has the government satisfied its victim notification obligations with respect to them?

MS. PECK:  We have, Your Honor.

THE COURT:  All right.  Does any victim wish to speak or have a statement read today?

MS. PECK:  Your Honor, they did send a letter previously for a different proceeding in the same case, and I think that that letter, we can make that part of the record.

THE COURT:  Has it been shared with defense counsel?

MR. WENC:  I haven't seen it.

MS. PECK:  Probably not, Your Honor, so I can actually e-mail it to him.  I have it digitally.  And then we can make it part of the record at that point.

THE COURT:  All right.  I think we should do that now and give defense counsel an opportunity to read it and go over it with Mr. Estrada if the government is intending for it to be part of the record here.

MS. PECK:  If I can easily do that during this, I will.  If not, I can relay what the letter says in open court.  I mean, I can give my statements about what the victims have told me.

THE COURT:  Okay.  Is there any objection to proceeding that way, Attorney Wenc?

MR. WENC:  Well, I guess I would like to see the letter because it wasn't really referenced in the government's sentencing memo and I don't really have a

sense as to what they would tell the court.

THE COURT:  Yeah, I think that if the government intends to rely on statements from the letter, that it ought to be provided to defense counsel.

MS. PECK:  I will see if I can do that now, Your Honor.  I know they don't want to be present.  I know they don't want to be in court.  They find that too traumatic.  So if I can easily provide it to defense, I will.  If not, we will proceed without it.

THE COURT:  Okay.  Just as an aside, there are obviously multiple defendants coming up for sentencing in this case, so it would be helpful if the government seeks to rely on that letter, to provide it to probation for inclusion in the presentence reports for those other individuals.

Okay.  Mr. Estrada, while Attorney Peck is looking for that letter, let me explain how things will proceed this afternoon.  The first part of what I need to do at a sentencing hearing is somewhat technical.  I will recite the procedural history of the case and discuss what I have reviewed in advance of today's sentencing.

Then I will be asking you and Attorney Wenc and then Attorney Peck if you all have read and reviewed the presentence report that was prepared by the U.S. Probation Office, and with respect to you, if you caught anything

that was incorrect in it, if you've told Attorney Wenc about those errors so that he could tell probation.

I will then do some technical calculations under the U.S. Sentencing Guidelines, and that will complete the technical portion of the proceeding.

Then I'll turn to hearing from the attorneys about what they believe an appropriate sentence is in this case.

When Attorney Wenc makes his presentation, I will invite anybody who wishes to speak on your behalf to make a statement at that time, and additionally, if you wish to make a statement, you may do so, though you should know that doing so is not required.

After I hear from everyone who wants to be heard, then I will go through the various factors that I have to consider in determining a sentence for you, and then pronounce the sentence toward the end of the proceeding.

With that order of operations in mind, are you ready to proceed?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  So with respect to procedural history, Mr. Estrada appeared before me on February 11th of 2025 and entered guilty pleas to Counts 1 and 3 of the indictment in this case charging him

respectively with conspiracy and kidnapping.

A presentence report was prepared for the court by the U.S. Probation Office.  The final report was dated August 11, 2025, and it had a first addendum, and then following that in the last couple of weeks, there have been second and third addenda to account for additional information.

What I have reviewed in advance of today's sentencing is the PSR and all of its addenda, Mr. Estrada's sentencing memorandum and its exhibits, including Dr. Baranoski's report, which is under seal, and the other under-seal exhibit report from law enforcement.

I have also reviewed the government's sentencing memo, including its exhibits, and then, finally, Mr. Estrada's reply brief and the letters of support that were submitted around the same time as the reply brief.

Is there anything additional the parties believe that I should have reviewed that I haven't mentioned here? Attorney Peck?

MS. PECK:  No, Your Honor.

THE COURT:  Attorney Wenc?

MR. WENC:  No, Your Honor.

THE COURT:  All right.  So then, Attorney Wenc, can I confirm that you've read the presentence report and its addenda?

MR. WENC:  Yes, Your Honor.

THE COURT:  And did you go over those documents with your client?

MR. WENC:  Yes, I did.

THE COURT:  All right.  Do you believe that your client understood the contents of the documents?

MR. WENC:  Yes.

THE COURT:  Do you have any objections to any of the factual statements set forth in the presentence report?

MR. WENC:  No, nothing other than I had submitted to probation before the final PSR was prepared.

THE COURT:  All right.  Mr. Estrada, did you read the presentence report and its addenda?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And did you go over those with Attorney Wenc?

THE DEFENDANT:  Yes.

THE COURT:  If you spotted any errors in those documents, did you let Attorney Wenc know?

THE DEFENDANT:  Yes.

THE COURT:  Attorney Peck, did you read the presentence report?

MS. PECK:  I did, Your Honor.

THE COURT:  And do you have any objections to

any of the factual statements contained in it?

MS. PECK:  No.

THE COURT:  Okay.  Then given that there are no objections to the factual statements contained in the presentence report, I will adopt the factual statements of the PSR as the court's findings of fact in this case.

Next, let me announce what I understand to be the maximum penalties that could be imposed today.  For Count 1, the maximum penalties are five years of imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

For Count 3, the kidnapping count, the maximum penalty with respect to imprisonment is life in prison. There is a maximum term of supervised release of five years, a $250,000 fine, and a mandatory $100 special assessment.

Next, Mr. Estrada, I am required to calculate what we call the Sentencing Guidelines range.  The guidelines are published by the U.S. Sentencing Commission and they provide a sentencing judge with recommendations on what could be a fair and just sentence in your particular case by looking at a number of different things, including the type of offense involved, the characteristics that might accompany that offense, your criminal record, if any, and a variety of other factors.

The end result of the process of applying the guidelines in a particular case usually results in a few ranges, a range in terms of months of imprisonment, a range of years of supervised release, and a range of a monetary fine.  Those are ranges that the Sentencing Commission believes could be appropriate in your particular case.

And, actually, I'll talk in a moment about a very recent amendment to the guidelines that suggests there won't be a range of supervised release, the length of the supervised release term.

Now, I am not bound by those ranges, but I do have an obligation to calculate what the range is and to consider it along with a number of other factors in determining an appropriate sentence for you.  So I'm going to proceed with calculating the guidelines range at this time.

So the first issue that I wanted to note is that Officer Leone has informed me that there were certain amendments to the guidelines that went into effect on Saturday, November 1st.  As far as he and I could tell, the only amendments that appear to be relevant here are those related to supervised release.  Specifically, it appears that the guidelines will no longer suggest a range of the length of a supervised release term because the

court should do an individualized assessment of the need for supervised release, so the guideline amendment now just matches the statutory term for a supervised release term length.  The guidelines also now provide that the court must state in open court the reasons for imposing or not imposing a term of supervised release and the reasons for choosing the particular length of the supervised release term imposed.

Do the parties understand these to be the only relevant amendments to the guidelines for purposes of today's sentencing?  Attorney Peck?

MS. PECK:  Yes, Your Honor.

THE COURT:  And Attorney Wenc?

MR. WENC:  Yes, Your Honor.

THE COURT:  All right.  Officer Leone, is there anything else I should be aware of with respect to the amendments?

PROBATION OFFICER:  No, Your Honor.  I think all that was correct.

THE COURT:  Thank you.  So then next does the government move for awarding Mr. Estrada the third point for acceptance of responsibility?

MS. PECK:  Yes, Your Honor, we do.

THE COURT:  All right.  That motion is granted. And it does not appear that there is a dispute about how

the guidelines should be calculated, so let me ask, does the government agree with the PSR's guidelines calculation?

MS. PECK:  We do.

THE COURT:  And does the defense also agree?

MR. WENC:  Yes, Your Honor.

THE COURT:  All right.  So then I am going to adopt the calculation of the guidelines as set forth in the presentence report.  It's a somewhat complicated calculation, so please bear with me.

With respect to the conspiracy count, the base offense level is 36 and there are no adjustments.  With respect to the kidnapping count, the base offense level is 32.  Two levels are added because a victim sustained serious bodily injury.  Two further levels are added because a dangerous weapon was used, here a baseball bat, so that results in an adjusted offense level of 36.  Three levels are subtracted for acceptance of responsibility, and so we have a total offense level of 33.  Based on the presentence report, Mr. Estrada falls into criminal history category one, with a total criminal history score of zero.

So with an offense level 33 and criminal history category one, the guidelines provisions are as follows: For imprisonment, 135 to 168 months.  For supervised

release on Count 1, a maximum of three years, and on Count 3, a maximum of five years.  Mr. Estrada is ineligible for probation under the guidelines.  The fine range from the guidelines is 35,000 to $250,000, and then as I said, there's a mandatory special assessment of $100 on each count.

Does the government intend to move for restitution on behalf of any of the victims?

MS. PECK:  Your Honor, I know they've been receiving services through the Office of Victim Services. I'm going to ask at the conclusion of this hearing for a window of time to check to see if there are expenses that would fall within the restitution statute, and so we anticipate that that is certainly possible that we will be moving for restitution.

THE COURT:  All right.  We'll take that up at the appropriate time.

So, Mr. Estrada, the guidelines ranges that I have announced are the guidelines that apply here in your case.  As I said, the guideline range is advisory only, but it is one thing that I must consider along with other factors.  So that covers, then, the calculation of the guidelines range.

I do want to just turn back momentarily to one issue that I asked Officer Leone to follow up on, and that

is that there is one outstanding arrest warrant for Mr. Estrada from the Miami Dade Sheriff's Office referenced in paragraph 57 of the PSR.  The arrest warrant is dated January 10th, 2025, but Officer Leone was able to review the records and it appears that the date of the incident was July 19th, 2024.  Given the close proximity of that alleged offense to the offense here, I think it would be appropriate to edit paragraph 57 to add a reference to say that the incident date was July 19th, 2024.  Does either party have an objection to proceeding that way?

MS. PECK:  Your Honor, I just wanted to make the record that Probation Officer Leone mentioned this to us prior to the proceeding beginning today.  I contacted the agent to find out because the probation office said they'd been unable to get the police report.  We don't have the police report either, but we do have a copy of the arrest -- I mean a search warrant affidavit that was submitted during that investigation.  The agent sent that to me right as the hearing was starting.  I forwarded it to Probation Officer Leone.  I can also forward it to Attorney Wenc, but I think it would set forth the dates that it occurred and all of the -- sort of the underlying conduct.

THE COURT:  And does it show that the incident

occurred on July 19, 2024?

MS. PECK:  I believe it does, Your Honor.  I didn't have a chance to go through it much because it was right when you were taking the bench, but I can check it now.  I also have forwarded the letter from the victims to Attorney Wenc by e-mail, so at some point if he needs time to look at that, he has it now.

THE COURT:  All right.  Assuming that that date is correct that probation identified and that the government has preliminarily confirmed, do you have any objection to adding to paragraph 57 that the incident occurred on July 19, 2024?

MR. WENC:  I would have no objection, but I want to take a look at the search warrant that the government has.

THE COURT:  Okay.

MR. WENC:  And I do -- I just received the letter composed by the victims.  I haven't had a chance to read it, so I'd like to have that opportunity and to have Mr. Estrada review it as well.

THE COURT:  Okay.

MS. PECK:  Your Honor, I can confirm that it states that the date was July 19, 2024.

THE COURT:  All right.  I think it may make sense to take a short recess so that defense counsel can

review those documents and to go over them with Mr. Estrada.  Does that make sense?

MR. WENC:  Yes.

THE COURT:  Okay.  Why don't we plan for ten minutes.  If you need more time than that, just let our courtroom deputy know, but otherwise I'll plan to come back out at 2:35.

MR. WENC:  Good.  Thank you.

THE COURT:  The court will stand in recess.

THE CLERK:  All rise.  The Honorable United States District Court for the District of Connecticut is now in recess.

(Whereupon, a recess was taken.)

THE COURT:  All right.  Attorney Wenc, did you have enough time to review those materials with your client?

MR. WENC:  Yes, Your Honor.

THE COURT:  Thank you.

MS. PECK:  Your Honor, could I just state for the record that I sent a copy of the letter and the search warrant affidavit to the probation office, to your courtroom deputy, and as well as to Attorney Wenc.

THE COURT:  All right.  Both documents that were e-mailed to the courtroom deputy were forwarded to me.  I did print a copy of the victim's letter and I have it here

with me.

I did not review the search warrant affidavit from the Miami case, but I'll take counsel's representation that the offense occurred on July 19th unless defense counsel sees things any differently.

MR. WENC:  That's what the search warrant affidavit says, July 19th of 2024.

THE COURT:  Okay.  So then in paragraph 57 of the plea agreement -- of the PSR, rather, I will ask the probation officer to include a sentence that states the incident occurred on July 19, 2024.

PROBATION OFFICER:  I will do that, Your Honor.

THE COURT:  Thank you.  Okay.  So now we're at the point where I can hear from counsel and anybody who wishes to speak on behalf of Mr. Estrada about what an appropriate sentence would be here.

So, Attorney Wenc, let me begin with you.

MR. WENC:  Yes, thank you, Your Honor.

THE COURT:  Before you start into your comments, do you have any objection to any of the proposed conditions of supervised release that fall into three buckets, the standard conditions, the mandatory conditions, and the special conditions proposed by probation?

MR. WENC:  No, we don't.  I did review the

addendum sent by probation with my client and he's aware of those conditions.

THE COURT:  Okay.  Thank you.  And no objection to them?

MR. WENC:  No objection.

THE COURT:  All right.  Go ahead, then, Attorney Wenc.

MR. WENC:  Okay, Your Honor, thank you.  I think the way I plan to proceed is I'll make a few comments on behalf of Mr. Estrada.  Then it's my understanding he wants to address the court.  Then after that, his mom and dad are present and they'd like to make some short statements to the court as well.

THE COURT:  Sure.

MR. WENC:  Okay.  So first of all, Your Honor, you know, in thinking about this, how to go about this sentencing, I -- it took me a while because this is a case that involves a very significant crime.  And so what I thought about is the first thing, it's harm, you know, the harm that was caused in this case.  I first thought about the victims.  SC and RC are their initials.  I did read the letter, and that put into more perspective the physical, mental, emotional and financial injuries that they sustained, and they certainly didn't deserve any of this.  And I just hope, and I know Mr. Estrada does, too,

that they continue to heal and recover from this terrible crime.

But there is also harm that was caused to Mr. Estrada's family and his friends. I mean, early on, right after he was arrested, I did meet with the parents. They came up to Bradley Airport and I met with them, and what struck me is just now distraught they were as to what their son had been accused of doing.

And then I looked at those letters of support from the friends of Mr. Estrada, and I think in each letter that I read, the message that came through is that, you know, they are harmed as well because they are not going to see Ricardo for a while. He's sort of out of their life. He's in suspended animation for years to come.

And then I thought about the harm that Mr. Estrada I guess inflicted on himself. He's in his early 20's, and that's the -- that's a decade where you sort of define yourself, where you sort of think about careers, you think about starting a family. It's an important decade. And that's where the -- you know, you think about that trajectory of your career, your family, and once again, that's going to now be in suspended animation for Mr. Estrada for years to come. So the incident of August 25th has had a tremendous ripple effect

on everyone involved here.

The next thing that struck me about Mr. Estrada in this case and delving into his background with the assistance of Dr. Baranoski is, you know, she indicated in her report that one of the sentinel factors in his development was this abuse of drugs and alcohol, and I think it seems that it increased -- or I think in general what drugs and alcohol do, they sort of increase the propensity to commit crimes.  It's not an excuse, but I think inhibitions sort of get dulled and people get involved in actions that they would not necessarily be involved in if they were sober.

In the probation officer's report, it seems to me that the alcohol, the Xanax, this drug concoction called Lean was used pretty much up until a point that he was arrested in this case, and I've just -- you know, I've got to imagine in some way, shape or form that that clouded his judgment as well as his ability to sort of think through the consequences of his actions.

THE COURT:  May I interrupt with a question there?  In the presentence report with respect to the substance abuse, for all the different types of substances, it was reported that the use sort of stopped around 2023, and since this offense occurred in August of 2024, I want to make sure that the facts are correct as to

the substance use.

MR. WENC:  Yeah, let me just double-check on that.

THE COURT:  Maybe I'm reading too much into it. In 76 and 77 there is description of the pain killers sort of peaking -- the peak use in 2023, and then it decreasing, and likewise for Lean.

MR. WENC:  Well, I'm looking at 74 and 75, which the last sentences of each paragraph indicates that in 74 the marijuana and I think there was some alcohol continued until his arrest in the instant offense.

The Xanax, the last time he used it was a couple of days prior to his arrest in the instant offense. That's in paragraph 75.

And then in 77, the last sentence says he used Lean approximately one week prior to his arrest in the instant offense.

THE COURT:  Okay.  I stand corrected.  Thank you.

MR. WENC:  Okay.  All right.  So, you know, this substance abuse has been very destructive to Mr. Estrada's development because it's continued for a number of years. And I think what struck me is that it may have been in Dr. Baranoski's report where Mr. Estrada did pretty well in school in science, and he wanted to become a scientist,

but with the drugs and alcohol, that dream has sort of faded.

One of the grounds that I had suggested to the court for consideration in imposing a sentence is this. You know, the big thing is we want to make sure that this never happens again, that Ricardo does not get involved in this sort of activity again after he closes the chapter to this incident, and it seems to me that drug treatment, drug rehabilitation is key to reducing recidivism, and so I think treatment has to be a large part of any conditions that the court imposes in its sentence, and I feel sort of confident in what I had raised as a consideration for the court in terms of, you know, emphasizing drug rehabilitation in relationship to recidivism because Mr. Estrada did indicate at least to Dr. Baranoski that since the time of his arrest, he's pretty much been sober -- well not pretty much.  He has been sober, and his mind has started to clear, and I think it's given him an opportunity to reflect, and he's told me that he enjoys being sober, and I hope and pray that that lasts.

You know, another thing about this case and Mr. Estrada and his background is this history of self-harm, you know, the history of since a young age of him cutting himself with I think it was glass and maybe a razor.  I think the way I understand it is you engage in

that behavior to sort of relieve yourself of some sort of emotional pain, some sort of sadness or anger and it brings temporary relief.  But then after that relief is gone, you start to feel guilt and shame for what you just did to yourself.

The self-harm goes beyond the cutting, though. I think his involvement in this case was self-destructive and harmful as well, and I know that given the opportunity to reflect since he's been arrested, he does feel a sense of guilt, shame and remorse for what he's done.  And I know that he can't undo what happened on August 25th, but in speaking to him, I think he recognizes that this can be a turning point in his life to move forward in a positive way.

You know, I also just wanted to refocus on Dr. Baranoski's assessment.  She pointed out some strengths of Mr. Estrada.  I mean, she indicated that he was young and immature, and I think that's -- you know, that's accurate, but the silver lining in all of that is that it now gives him the opportunity to sort of point himself in a positive direction and to change.

She indicates that he's in need of drug treatment.  He's been sober since his arrest.  She did point out that he likes to work.  He's employable.  He had the initiative to get his GED while he was at Manson

Youth.

Also what's important is that he does have a supportive family.  You know, I've met with the family maybe on one or two occasions, but I have had frequent contact with some of his friends down in Miami who care very much about him and what happens today, so I think that's a good thing for him.

You know, in terms of programming at the Bureau of Prisons, Dr. Baranoski agrees with the recommendations made by probation as to perhaps, you know, drug programs there and vocational programs.  She thought that Ricardo does well with structure, and in terms of supervised release that's imposed, I think that can provide, you know, a structure for him once he's released.  And she did indicate that a psychiatric assessment would be helpful as well.

So, look, I don't have a magic number.  I don't -- I really don't want to do that, say things, but all I know is that I would just request that you impose a sentence that's not greater than necessary in order to do justice here.

Okay.  So, let's see, I think, Ricardo, did you want to address the court?

THE DEFENDANT:  Yeah.

MR. WENC:  Okay.  Why don't you come up here.

THE DEFENDANT:  I just wanted to start off by saying sorry to the hard-working parents who were victims to the crime committed on August 25th of 2024.  Nothing that I can say or do could take back the trauma and the pain that was caused to you and your families that day. I'm not here to say that I was following someone else's vendetta or to make anyone feel sorry for me.

I'm here to accept full responsibility for my actions and apologize to the victims.  I want to directly say to them I hope you'll recover from the fear, aggression and confusion you had to endure that day and that you will never have to be in fear of being put in such a scenario ever again.

I'm not going to pray for your forgiveness because you don't owe it to me.  I pray that one day you can move forward and not let that day haunt you for the rest of your life.  Once again, I'm sorry from the core of my heart.

Since my incarceration, I've been trying to figure out how to make this right, and I've realized I can't.  The only thing I can do is change and make myself a better person.

I came to jail with barely to no high school credits and a mindset of never graduating.  In six months I achieved my GED without failing a test and earning high

scores on each one of them, something that I would have deemed impossible.

I focused on religion and strengthening my relationship with God, which I always felt like I was missing.  To the time that I get sentenced today, I want to use it to understand myself and others better.  I want to reach a higher level of education and change who I am and start working on who I want to be, get closer to my parents and my fiancee, who are sitting right behind me, and right my wrongs the best way that I can.

As for right now, I'd like to say my truth because nobody else can say it for me.  I never touched or hurt anyone that day.  My involvement in this crime has been thrown around from being the driver of the white Honda, to being the aggressor, to being the driver of the Lamborghini.  I never held a bat in my hand.  I never punished anyone and I didn't have no bruises or marks on my hands or arms.  They said this was all a planned thing, but I'm being put in every scenario as if I didn't have a role to play.  I'm allegedly everywhere but with the kidnappees in the van that day.

Today I hope I get judged for the actions I've committed and not the ones that they say I have.  I'm not a violent person and I hope I don't get condemned like one.

And also I just read the letter, and the letter also implied that the victim only seen three to four individuals hop out of the -- jump out of the car, which were the three or four individuals that got arrested in the van that they were found at.  He also mentioned that all the harm that was caused to him was made in the van.  They got tied up in the van and they got harmed physically in the van.

None of it happened in the scenario that they are trying to put me in.  There were four individuals in the van.  Four individuals jumped out of the van, and four individuals got arrested that day in the crime scene. That's all I'd like to say.  Thank you for listening.

THE COURT:  Thank you, Mr. Estrada.

Attorney Wenc, I forgot one question I wanted to ask you and that relates to the October 3rd, 2025 disciplinary violation for assault.  To the extent you have details about that and would like to share them, I'd be interested in hearing about them, and also about your perspective on how that fits into the picture of Mr. Estrada given its recency and the nature of the violation.

MR. WENC:  Right.  I think my understanding of that episode which occurred here in Hartford Correctional is that there was, I guess, some issues between roomies,

Mr. Estrada and the roommate who shared the bunk head.  I think what had happened was that Mr. Estrada had some concerns about how the roommate had been conducting himself and expressed those to him, expressed his concerns to the roommate, who then I guess on October 3rd jumped off the top bunk and took a stance, which resulted in fisticuffs, and I guess Mr. Estrada bested his roommate in the fisticuffs and he was -- you know, he received a disciplinary ticket for assault.

I guess the way I look at it is that it was frustration building up over time between two roommates in close quarters.

You know, in terms of the recency, once again the only thing I can explain -- seek to explain is that it was -- it had reached a boiling point and you've got a roommate who jumps from the top bunk down in front of you, and I guess the situation unravels.

THE COURT:  Okay.  Thank you.

MR. WENC:  Okay.  So I think next I'd like to have his father, Yovani, address the court.

THE COURT:  Sure.  How do you spell the name?

MR. WENC:  It's Y-o-v-a-n-i.

THE COURT:  Okay, thank you.

YOVANI ESTRADA:  Good afternoon.

THE COURT:  Good afternoon.

YOVANI ESTRADA:  I wanted to say that my son is no criminal.

THE INTERPRETER:  The interpreter needs, Your Honor, please to just verify what he said.

THE COURT:  Sure.

YOVANI ESTRADA:  He's no criminal.  I brought him up for him to study, and he studied to be a security guard.  He has his ID for that.  I showed his attorney that.  And the only thing I can think of, it was the drug consumption, and it got out of my hands.  I couldn't help with that, with the drugs.

The same day I had a heart attack and I had an operation for it.  And I apologize -- and I apologize to those people that this happened to, but he didn't hit anyone.  I mean, he didn't do that to him.  He told me.  I hope you will view that well.  And what he did, I mean, what he did was not right.  And that was all I wanted to say.

THE COURT:  Thank you.

YOVANI ESTRADA:  Thank you very much.

MR. WENC:  And finally, Your Honor, his mother, Maria.

THE COURT:  And could you spell that name, please?

MR. WENC:  Say that again.

THE COURT:  Just spell the first name.

MR. WENC:  Maria is M-a-r-i-a.

THE COURT:  Thank you.

MARIA ESTRADA:  Good afternoon.

THE COURT:  Good afternoon.

MARIA ESTRADA:  My name is Maria Estrada.  I'm Ricardo Estrada's mother.  I just wanted to say that I have raised Ricardo with a lot of love.  He was a very loved child.  I've devoted my entire life since I had him to give him a good life, to make sure that he didn't want for anything, and his father and I have both worked very hard.  We're people of modest means.  And I still even now don't understand how my son got to this point.  I know he's not a violent person.  He's never seen violence in our household.

And since he's been 14 years old, he's worked. We got him working.  He worked in Pizza Hut, he worked in security.  He worked with me.  He helped deliver meals during Covid.  I always had him with me to show him how good life was.

He's always been a good and quiet child.  And that's all I wanted to say about my son.

You know, as far as the people that he was with and the people that were harmed in this crime, I want to apologize.

And one thing I did want to say, and I'm sure that with what he did, he was not in his right mind.  I'm sure.  Thank you very much.

THE COURT:  Thank you.

MR. WENC:  Your Honor, that's the end of my presentation.

THE COURT:  Thank you, Attorney Wenc.  I'll give you an opportunity to reply if you wish after Attorney Peck proceeds.

MS. PECK:  Good afternoon, Your Honor.  I would like to start where the defendant left off because I think that -- I'm sure the court understands, but I want to make sure the record is very clear about what the evidence shows in this case concerning his participation in this crime.

His suggestion that the victim's letter is somehow exonerating him is a misreading of that letter. The situation that happened was that the victims' SUV, a Lamborghini SUV was rear-ended by the Honda Civic and then surrounded on all sides.  The van was on one side, a Nissan was on another side, and the Honda Civic was in the back.

When the victims told the police what happened the day that it happened, they said together that six to seven men jumped out of the vehicles that were surrounding

their car, pulled them forcibly from their SUV, physically attacked them on the street, and then dragged them into the van where they were then further assaulted.  They described the six or seven individuals as wearing black and masked and armed with baseball bats.

When the victim's letter -- it's a letter written by one of the victims, the male victim.  He describes three or four jumping from the van, which was on his side, and coming at him.  But there were other individuals, including this defendant, who were part of jumping out of their vehicles and grabbing the second victim who was on the other side of her SUV.

This defendant was thereafter videotaped by another co-conspirator getting into and driving the victims' Lamborghini away from the scene.  When that Lamborghini was recovered by police, there was a baseball bat found in the front seat of that car.  The victims didn't have a baseball bat.  That was left in the car by the person, this defendant, who got in and drove it.

THE COURT:  Was he the only one driving --

MS. PECK:  Yes.

THE COURT:  -- or was the other person in the car videotaping this?

MS. PECK:  No, it was from outside as I understand it, and there was the Honda Civic that was also

being driven so that they could get away from the scene.

They ultimately ended up leaving the Lamborghini off in a wooded area and then fled, this defendant and one of the others fled the scene and went back to the rendezvous point, which was in Roxbury.

So this idea that he has told himself and that it sounds like he's told his parents is completely contrary to the evidence in the case.  He was very much a part of what happened to these victims.

And as the court is aware from the presentence report, this is not his first brush with violence. Obviously we have the July 19th incident which involved both Reynaldo Diaz and Angel Borrero in addition to Mr. Estrada.

As we noted in our sentencing memo, the first person Mr. Borrero called to come to Connecticut was Mr. Estrada.

Even in Dr. Baranoski's report, which we have some issues with the report in general, but she does say that his describing his Bitcoin, he's reticent about describing his Bitcoin activities, but does note that it's a violent game.  It's a game that involves kidnapping for code regularly.

We know that some of these other crimes, including the one for which there is an active warrant,

did involve victimizing people in this cryptocurrency world, so violence is not something -- I mean, I understand that perhaps the parents don't know everything their son has done.  Perhaps they want to believe that he hasn't done the things that are horrific, but that's just not the case.  That's not the evidence.

And I'm frankly concerned about the fact that the defendant gets up here and minimizes his role.  You know, we have given him credit for acceptance of responsibility.  Acceptance of responsibility means owning up to what you did, and in front of this court today, he didn't do that.

And I would note that the facts as stated in the presentence report definitely talk about what the victims told the police that day about the number of people that surrounded them and how they were beat before they ever got into the car -- into the van.  So that's not the evidence in the case.

In looking at this, and I know the court has thought a lot about this, obviously there are a number of factors that the court will consider when deciding what the correct sentence is in this case.

First and foremost is always what did the defendant do.  This is a case that involved serious and horrific violence.  It's a case that involved callous

indifference to the victims here, a desire to exploit a vulnerability that was really unrelated to the actual hands-on victims here, a vulnerability that their son had because of his procuring millions of dollars in cryptocurrency illicitly.  So he was vulnerable to this kind of crime because he's not going to be able to consult authorities or tell them what went on or how he has what these people are wanting to steal, and they know that.  I mean, that's part of the whole reason for this kind of crime.

The victims here suffered and continue to suffer greatly.  They are haunted by what happened to them that day.  They can't -- the female victim can't leave her house.  She no longer runs her business.  She is in tears much of the time.  The anxiety and the dread and the fear that her house is being watched, that if they go out, this will happen to them again, that her husband will be hurt when he's away from her, all of these things are things that she is dealing with on a moment-by-moment basis.

As we have mentioned, they obviously -- it had a catastrophic effect on their employment.  They are here or were here on a Work Visa.  That is now in limbo.  We are making efforts to try to see what can be done, but as everybody is aware, the immigration situation in this country right now is difficult, and so it's unclear what's

going to happen to them, and they've been in this country for the better part of two decades.  I believe it's, you know, really the only place their son has been raised.

And this crime was motivated strictly by greed. And the notion -- and I am going to talk about the drug abuse in a minute, but the notion that this was something sort of impulsive or spur of the moment or, you know, your inhibitions are down, they thought about this for a long period of time.

You know, Angel Borrero was up in Connecticut for a day before he called.  He was doing surveillance. He was coordinating with the people who planned this.  He was, you know, helping another crew that was on the ground that was trying to commit a Hobbs Act robbery, and when he was asked do you have the ability to make this happen if this other crew leaves, he's, like, sure, and the first person he calls is Mr. Estrada.

Then thereafter he calls the others.  They get there, flying thousands of miles and spend the better part of two days planning, surveilling, stalking, coordinating, thinking this through, finding the right place.

This was a crime that took place over an extended period of time.  It was very thought through. They knew exactly what they were going to do as far as where they were going to take the parents.  They knew what

they were going to do when it came to extorting the cryptocurrency out of their son.  All of that had been discussed at length over telegram.  So it is -- it is the kind of crime that belies any suggestion that it's, you know, a spur of the moment impulsive kind of crime.

So obviously the need to provide just punishment is a huge factor in the government's view.  And also the other objectives, protecting the public, deterring this kind of crime.

This case is getting a lot of attention and there is a world out there in which this is -- these things are happening, and the people that are interested in this kind of cryptocurrency world and the world of extortions and robberies in this realm are very focused on this case and related cases to see what happens.

It's a case where deterrence is important and, frankly, promoting respect for the law, because this is sort of a -- and even the discussions about what the bitcoin world is like in Miami.  It's a Wild West situation, and there needs to be a message sent that there will be a serious consequence for engaging in this kind of crime.

The main argument that's being made today about mitigating the sentence is the use of drugs.  I, too, read the presentence report similarly to the court in that it

looked like there was a peaking of drug use that had -- there was less of it before -- in the year before this crime happened.  Not to say he wasn't still using drugs, but it wasn't at its peak.  That's how I read the presentence report, and it sounds like that's correct.

The guidelines -- and I know that the departure sections are no longer part of the guidelines, but the underlying thought about the use of drugs and alcohol is that there is such a close connection between crime and substance abuse that it's not an extraordinary case where those two things come together.  It happens all the time.  In most cases that I handle, those two things often come together.  And so it's not something that in the research that went into the guidelines and putting those things together, it was not something that was seen fit to lead to a lesser sentence because of the strong propensity to commit crime when you're engaging in those kind of things.  It happens all the time.

And the other thing that was discussed perhaps in the memo more than today is the notion of age and what role that should play in determining a sentence here.  I would note that much like gang violence, this kind of -- this crypto world is a young man's game.  In this case even the people that were at the top of the list and planning it are young men.  People are doing this in their

teens.  They are doing it in their early 20's.  It would be the norm in these kind of cases that we're talking about people who are young, just like in the gang world we're often talking about people who are very young.  But the havoc they are wreaking is enormous, and if we were to say that age excuses that havoc in some respect, we would be cutting this -- I mean this crime would be immediately discounted because of just the nature of this kind of case.  It's always going to be a young man's game.

I was impressed by the parents of Mr. Estrada.  It reflects what's in the presentence report, that he was fortunate to be brought up in a home where he had two parents who were with him, who seemed to focus on wanting to make a better life for him, wanting him to get a good education.

I noted he was in a magnet school before he dropped out.  He seems to be someone who is intelligent and able to master, you know, subjects and knowledge, and would be able to be readily employable.

His mother, I noted she was devoted to him, kept him with her and wanted to ensure that he was well cared for.  That puts him in a very different position than a lot of defendants.  A lot of defendants don't have that kind of background or parenting.  And, you know, I think the harsh reality is that he decided to go a different way

than the way they wanted him to go, and he was perhaps lured by the notion of easy money, the excitement of this game.  Obviously there is peers that are involved in it, too, and peer pressure is a thing.  But none of that changes the seriousness of his conduct and none of that changes the cost to both the victims and to the society at large of this kind of conduct.

So we are advocating, Your Honor, that you give a sentence that's commensurate with the guidelines range here because I believe that it addresses not only the seriousness of this crime, but it also recognizes the road that this defendant put himself on over the course of the last year where this violence was not a one-off.  It was part of a sequence of events that led to this.  Thank you.

THE COURT:  Thank you.  Attorney Wenc, do you wish to reply?

MR. WENC:  Yes, just briefly.  Just briefly, Your Honor.  You know, I did speak with Mr. Estrada.  I mean, he maintains that at the scene he did not lay hands on anyone.  It was a chaotic scene.  He did take that Lamborghini and drive it away.  In terms of the baseball bat that was there, I can't explain how that baseball bat got inside the car.  It was a chaotic scene.  Perhaps someone threw that bat inside the car.  I don't know.  I don't know, and I don't want to -- there is multiple

theories.

But the bottom line is that Mr. Estrada acknowledged that he did participate in this kidnapping, in this conspiracy, and it was a violent act which he has remorse for.

You know, in terms of the drug use, I don't think I was saying that the drug use is an excuse for participation in this incident.  I think what I was trying to argue in my sentencing memo is that there is a strong history of drug abuse with respect to Mr. Estrada and that the focus -- if we want to sort of minimize any risk of recidivism, focus on the drug rehabilitation rather than a harsher sentence.  I guess that's the point I'm trying to make.

But if you look at the drug use, if you look at the age, which I think Dr. Baranoski indicated, look, at that age there is impulsivity.  There is inability to foresee consequences.

And then if you look at the mental and emotional history and condition of Mr. Estrada, I think if you take all of those together, the totality of the circumstances I think weigh in favor of the court considering some mitigation in terms of imposing a sentence here.  So that's all I have, Your Honor.

THE COURT:  Thank you, Attorney Wenc.

Just a bit of housekeeping.  Since we now have the victim letter which has been shared with the defense, and both Attorney Wenc and Mr. Estrada made reference to it, I am going to order that it be incorporated into the presentence report under the victim section.

PROBATION OFFICER:  I can do that, Your Honor.

THE COURT:  Thank you.  The next thing that I want to just get out of the way is conditions of supervised release.

Mr. Estrada, I don't think it will come as a surprise to you that you are going to be sentenced to a term of incarceration, and following that term of incarceration there will also be a period of supervised release, which is supervision by the U.S. Probation Office where you'll be required to abide by a number of conditions.

I want to go ahead and announce those conditions now since they are somewhat lengthy.  They fall into three different categories, what we call standard conditions, what we call mandatory conditions, and then what we call special conditions.

So the standard conditions are as follows.  As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic

expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

First, you shall report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment unless the probation officer instructs you to report to a different probation office or within a different time frame.

Second, after initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when to report to the probation officer, and you shall report to the probation officer as instructed.

Third, you shall not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

Fourth, you shall answer truthfully the questions asked by your probation officer.

Fifth, you shall live at a place approved by the probation officer.  If you plan to change where you live or anything about your living arrangements such as the people you live with, you shall notify the probation

officer at least ten days before the change.  If notifying the probation officer in advance is not possible due to unanticipated circumstances, you shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

Sixth, you shall allow the probation officer to visit you at any time at your home or elsewhere, and you shall permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

Seventh, you shall work full-time, at least 30 hours per week at a lawful type of employment unless the probation officer excuses you from doing so.  If you do not have full-time employment, you shall try to find full-time employment unless the probation officer excuses you from doing so.

If you plan to change where you work or anything about your work, such as your position or job responsibilities, you shall notify the probation officer at least ten days before the change.  If notifying the probation officer at least ten days in advance is not possible due to unanticipated circumstances, you shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

Eighth, you shall not communicate or interact

with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you shall not knowingly communicate or interact with that person without first getting the permission of the probation officer.

Ninth, if you are arrested or questioned by a law enforcement officer, you shall notify the probation officer within 72 hours.

Tenth, you shall not own, possess, or have access to a firearm, ammunition, destructive device or dangerous weapon, that is, anything that was designed or was modified for the specific purpose of causing bodily injury or death to another person, such as nunchucks or tasers.

Eleven, you shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

Twelfth, you shall follow the instructions of the probation officer related to the conditions of supervision.

Upon a finding of a violation of supervised release, you understand that the court may revoke supervision and impose a term of imprisonment, extend the term of supervision and/or modify the conditions of

supervision.

So those are the standard conditions.

Next are the mandatory conditions.

First, you shall not commit another federal, state or local offense.

Second, you shall not unlawfully possess a controlled substance.

Next, you shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter for use of a controlled substance.

Next, you shall make restitution in accordance with federal law and pay the assessment that has been imposed of $100.

And then you shall cooperate in the collection of a DNA sample.

Finally, there are what we call special conditions of supervised release, and I am going to impose the following three special conditions.

First, you must participate in an educational and/or vocational services program and follow the rules and regulations of that program.  Such programs may include, but are not limited to, high school equivalency preparation, job readiness training, and skills

development.

That condition is being imposed to assist you with employment following your period of incarceration.

Second, you must participate in a program recommended by the probation office and approved by the court for inpatient or outpatient substance abuse treatment and testing. You must follow the rules and regulations of that program. The probation officer will supervise your participation in the program. You must pay all or a portion of the costs associated with treatment based on your ability to pay as recommended by the probation officer and approved by the court.

That condition is recommended based on your history of substance abuse.

Third and finally, if you are ordered deported from the United States, you must remain outside of the United States unless you are legally authorized to reenter.

If you reenter the United States, you must report to the nearest probation office within 72 hours after you return.

That condition is being imposed based on your current status with immigration and customs enforcement and the potential that you may be deported after sentencing in this case.

I will also order that supervision be transferred to the Southern District of Florida where you were a resident and presumably would intend to return to after any term of imprisonment.

So those are the conditions of supervised release.

To determine the length of any sentence of imprisonment and the length of any term of supervised release, there are a number of factors that I need to consider. They include the nature and circumstances of the offense and your history and characteristics, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes you might commit, to provide you with needed treatment in the most effective manner.

The Sentencing Guidelines are something I must consider, and I must also look at the need to avoid unwarranted sentencing disparities, meaning differences between the sentence that you receive and the sentences that others who are similarly situated receive.

In short, I have to consider everything that I have learned about you through this process, the good and the not so good, and weigh all of that information to

determine a sentence that is fair, just and reasonable in your individual case, and that is sufficient but not greater than necessary to serve the purposes of sentencing.

Let me walk through how I'm considering these various factors here in your case. With respect to the seriousness of the offense and the need for just punishment, undoubtedly this was a very serious offense. It involved a well-planned and premeditated act of violence that required that you travel here with a group of people from out of state, rent a home and vehicles for the duration of the plan, surveil the victims and plan for this attack, and then the brutal assault and kidnapping of them, along with the fleeing from police.

I'll discuss in a moment your comments about your role, but suffice it to say that the group as a whole inflicted an extraordinary amount of harm on these two victims, not just physical harm, but also emotional harm.

We see from the letter written by the male victim about how devastating this was to him, and the government has represented that the female victim has come to a point where she no longer wants to leave her house because she is fearful that if she were to leave, something like what you and your co-conspirators did could happen again to her. This is a nightmare that they will

continue to live for every day, and you put them in that situation along with your co-conspirators.

Your behavior has very serious lasting consequences for them psychologically, and the seriousness of this offense would alone justify a very lengthy sentence of imprisonment.

I'm also weighing the need to protect the public and to deter you and others from committing crimes like this in the future.

You have said that you're not a violent person and it appears to be your position that it was your co-conspirators who physically assaulted the two victims here, but I cannot accept that general proposition that there is no need to protect the public from your activities.

First, involvement in this crime with this group of people itself suggests to me that you have a tendency for violence because there is no indication that you didn't know what was going to happen when those vehicles blocked in the Lamborghini.  The whole purpose of the plan was to kidnap those victims, make them fearful, and in the process attempt to extort their son for millions of dollars, and so the very nature of this plan was violent. Regardless of who did what and who held the bats, it is a violent crime and you were involved in it, and that makes

me believe that the public needs to be protected from you and your co-conspirators.

I recognize that you had no criminal history that counts for guideline purposes here, but you do have arrests and charges that were dropped, including for carrying a concealed weapon when you were 18, for robbery and larceny when you were 20, and then there is the outstanding arrest warrant for an incident that happened just a month before this one that others of your co-defendants also are named in the arrest warrant.

The fact that you were willing to engage in this premeditated form of brutal group violence for the promise of money reflects to me that you pose a danger to the public.

I have read the Baranoski report and I don't think that Dr. Baranoski came up with the phrase kidnapping for code herself.  That appears to be something that perhaps you shared with her, and the government has made the point that this is occurring more and more often because of the amount of money that is flowing through cryptocurrency markets and the possibility for violence to accompany that cryptocurrency trading.  And kidnapping for code just by its very nature, and even just -- if it is what it sounds like is violent and it needs to be deterred.

You have to be deterred specifically because you need to know that committing this type of crime is not acceptable.  It has harmed not only those victims, but society as a whole.  And in some cases I don't find general deterrence to be an important factor, but in this world where kidnapping for code in your own words is a thing, obviously it is happening, and it is happening in ways that harm people, so the sentence needs to send a message to others that this type of behavior will not be tolerated and will be punished significantly.

Now, I have looked as well at your history and characteristics.  By all accounts, although you moved around as a child, you had two very supportive parents who worked in legitimate jobs and who really tried to provide for you as best they could, including by supporting your education.

And I appreciate your presence and your comments here today.  It does appear that you did the best that you could with your child.  Why he went on this track is something I'm sure you are wondering about, but what I am faced with is the fact that he did.  And we can all speculate about the reasons, some of which I'll discuss in a moment, but I want you to know that I take to heart your comments that you worked very hard to provide him with a very good life.  And that isn't true of all people who

come before me.

A lot of people come before me without supportive family, without opportunities for education, and from communities where violence was a part of their everyday life, and none of those things were true for you. You had the opportunity for education. You had a supportive family, and you had no violence in your home or even in your neighborhood, so it does cause me to question how and why you got involved with this crime.

Now, I understand you have struggled with various mental health considerations over the years, including one hospitalization that is corroborated, and other self-reported instances of self-harm.

I've looked at Dr. Baranoski's report, though, and she makes no specific diagnosis of a mental health condition that you're currently struggling with. In fact, she says you have no significant cognitive deficits, which shows me that you are an intelligent person and that you could have made the correct decision here, but chose not to.

She attributes your involvement in this case to drug addiction and to a mindset of being a follower and not a leader. She says that you got caught up in a social group where drugs and the allure of fast money offered you some sort of structure.

I think that that understates your level of volition in this crime.  Based on the government's exhibits to the sentencing memo, you were the first person that Mr. Borrero called when he said that he knew the perfect people to carry out this brutal crime, and I agree with the government's assessment that this was not a crime of impulse.  This was a crime of premeditation planned over a period of time that resulted making bad decisions at many different turns.  First, agreeing to do it.  Second, getting on the plane to Connecticut.  Third, spending a couple of days here watching the victims and figuring out how this was going to be accomplished.  And fourth, all of the actions that occurred on August 25th itself.

At any one of those points, you as an intelligent person could have decided I'm out, I don't want to be part of this.  But instead, you did participate.  And I don't see based on the facts that I know about this that you were someone who sort of was brought along for the ride or just tagged along.  Instead, you were a central player in this brutal crime.

Now, I do acknowledge that you appear to have a substance abuse addiction and it does appear possible that your decision-making with respect to this crime was clouded in some fashion by that addiction, but it does not

appear to be so severe that you were not capable of making the correct choices with respect to your participation here.

With respect to your age, it is true that you were on the younger end of the spectrum in terms of defendants we see in federal court, but as the government points out, everybody who committed this particular offense is young.  I think it ranges from ages 18 to age 23.  And more generally, kidnapping for code, to use your term, is a business engaged in by young people.  So even though you are young, I don't think that's a significant mitigating factor here.

I do think that you genuinely are remorseful for this incident and I appreciated your comments, specifically that you have reflected on the fact that there is nothing you can do to undo the actions of August 25th, and the only thing that you can do to try to make up for it is to better yourself, and so I do appreciate that you have worked hard while in prison to earn your GED.  That's a good development and it shows me that you are looking toward the future.

At the same time, though, you received a disciplinary ticket for assault just a little more than a month ago, and so that supports my hypothesis that there is at least somewhat a need to protect the public because

an assault of your cellmate so close to your sentencing date does suggest to me that there are some violent tendencies at the very least.

With respect to employment, you did work in a -- and you were employed here and there, but it appears that the lure of a potentially large sum of money is part of the reason that you committed this crime, and so the sentence needs to make sure that you understand that literally crime does not pay.

So when I look at all of this information and I'm faced with the obligation to formulate a sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing, I understand that you have not served a significant term of imprisonment before, but I really cannot find that there are sufficient reasons to depart from the guidelines here for the reasons that I've expressed.

I think a sentence within the guidelines range is appropriate to account for the seriousness of the offense, the need for just punishment, the need to deter you and others, and perhaps most importantly the need to protect the public, but a sentence at the bottom of the guidelines range is sufficient but not greater than necessary to serve those purposes.

So for those reasons, I'm going to sentence you

as follows, to a term of imprisonment on Count 1 of 60 months, or five years, and to a term of imprisonment on Count 3 of 135 months, which is 11.25 years, to be served concurrently.

The supervised release term will be two years to follow any term of imprisonment. I believe that supervision is appropriate to help you rehabilitate and transition from this long period of imprisonment into society, and two years appears to be an appropriate amount of time for those purposes to be served.

I will impose a special assessment of $200. I will not impose a fine as I find you have no ability to pay one.

I have already gone over the conditions of supervised release. As I stated before, they are the standard conditions, the mandatory conditions, and the special conditions, all of which will be imposed.

Officer Leone, have I overlooked anything or do you have any additional comments?

PROBATION OFFICER: One thing, Your Honor, just kind of for the record. Is that two years of supervised release on both Count 1 and Count 3?

THE COURT: Yes. Thank you for clarifying that. Two years of supervised release as to each count to be served concurrently.

PROBATION OFFICER:  Thanks, Your Honor.

THE COURT:  Thank you.  Does either counsel know of any reason why the sentence I have described cannot legally be imposed as the sentence of the court, or are there any procedural deficiencies that I can correct?

MS. PECK:  I'm not aware of any reason why this can't be imposed, Your Honor, and I can speak to restitution when the court is ready for that.

THE COURT:  Okay.  Why don't we go ahead and take that now.

MS. PECK:  I would just ask if you can give me even 14 days to put together a restitution order so I can check with our victim witness people and the Office of Victim Services to see what may be due to the victims of this case.

THE COURT:  Okay.  I think that the statute allows for a period of ninety days, so I can give you that much time to submit a restitution request if there is one.

MS. PECK:  Yes, that would be great, Your Honor.  Thank you.

THE COURT:  Okay.  Attorney Wenc, do you know of any reason why the sentence I have described cannot legally be imposed by the court, or are you aware of any procedural deficiencies with the sentence that I should correct?

MR. WENC:  I'm not, except that, you know, Mr. Estrada, you know, felt as though that there would be some grounds for a non-guideline sentence, which Your Honor decided not to impose.  Other than that, nothing else.

THE COURT:  Okay.  Thank you.  So what happens next, Mr. Estrada, is that the judgment of the court will be prepared for my signature by the clerk's office in consultation with the U.S. Probation Office.

Now, if you wish to appeal, you must file a written notice of appeal within 14 days of the entry of judgment.  You can ask Attorney Wenc to file that notice of appeal for you, or you can file it yourself.  Do you understand the time limit for filing a notice of appeal?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  If you wish to appeal but can't afford to do so, you can apply for leave to appeal in forma pauperis, and if it's granted, the court would waive the filing fee for your appeal and appoint a lawyer to represent you at no cost to you.

Now, in your plea agreement you had agreed that you would not appeal your conviction in this case, and further, you had agreed that you would not appeal your sentence if the sentence did not exceed the following parameters:  135 months of imprisonment, three years of

supervised release, and a $200 special assessment.  And I think I need to correct myself and state that the special assessment was $200.  If I had said $100 before, it is 200, 100 for each count.

Now, I believe that the sentence that I have imposed falls below each of those thresholds in your plea agreement, but if you nevertheless wish to appeal, you must file that notice of appeal within 14 days of entry of judgment.  Judgment is likely to be entered either today or tomorrow, so the entry of it will start your time limit for filing the notice of appeal.

Attorney Peck, is there a request to dismiss any counts?

MS. PECK:  Yes, Your Honor, Count 2, which is the carjacking count, we would move to dismiss that.

THE COURT:  All right.  That motion is granted.

Attorney Wenc, I believe that you had requested a designation as close to Miami as possible; is that correct?

MR. WENC:  Yes, that's correct, as well as eligibility for the RDAP program.

THE COURT:  Okay.  I don't -- are you aware that I can make any recommendation as to RDAP?

MR. WENC:  All I know is I requested it in the past from different judges, so that's what I'm going on,

Your Honor.

THE COURT:  Okay.  Well, I'm happy to make a recommendation that the Bureau of Prisons consider Mr. Estrada for participation in that program, and I will also make a recommendation that he be allowed to serve his sentence at a facility as close to Miami as possible to facilitate visits with his family.

Is there anything further I should take up from the government's perspective?

MS. PECK:  No, Your Honor.

THE COURT:  And anything from Mr. Estrada's perspective?

MR. WENC:  No, Your Honor.

THE COURT:  All right.  Mr. Estrada, I wish you the best of luck.  The court will stand in recess.

THE CLERK:  All rise.  The Honorable United States District Court for the District of Connecticut is now in recess.

(The proceedings ended at 3:56 p.m.)

C E R T I F I C A T E

I, Denae L. Hovland, RPR, CRR, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the proceedings of a hearing which was held in the above-entitled action on November 3, 2025, were recorded by Denae L. Hovland by stenograph; that thereafter I transcribed in typewriting the foregoing transcript to the best of my ability; that the foregoing transcript constitutes a true and accurate transcription of the proceedings of such hearing.


/s/Denae L. Hovland
Denae L. Hovland, RPR, CRR, RMR
Official Court Reporter
United States District Court
450 Main Street
Hartford, CT  06103